New England Telephone & Telegraph Co. *v.* Dept. of Public Utilities.

NEW ENGLAND TELEPHONE AND TELEGRAPH COMPANY
*vs.* DEPARTMENT OF PUBLIC UTILITIES.

Suffolk.    May 7, 1976. — September 14, 1976.

Present: REARDON, BRAUCHER, KAPLAN, & WILKINS, JJ.

*Public Utilities. Telephone Company. Constitutional Law,* Public utilities. *Practice, Civil,* Review of order of department of public utilities.

On an appeal by a telephone company challenging as unconstitutionally confiscatory an order of the Department of Public Utilities which disallowed rates filed by the company, it had a right to an independent judicial review as to both law and fact; on other claims the standard of review was governed by G. L. c. 30A, § 14 (8). [70-71]

In a proceeding to determine whether to allow rate increases filed by a telephone company, the Department of Public Utilities was permitted to use a method based on an adjusted historic test year but it could not ignore confiscatory effects of inflation in doing so. [71]

On an appeal under G. L. c. 25, § 5, by a telephone company challenging as unconstitutionally confiscatory an order of the Department of Public Utilities which disallowed rates filed by the company, this court could consider additional evidence becoming available after the Department's order, subject to verification of its accuracy by the Department. [71-72]

In a proceeding to determine whether to allow rate increases filed by a telephone company, the Department of Public Utilities erred in failing to make any allowance for attrition in the company's rate of return caused by increased investment and higher building costs. [72-74]

On an appeal by a telephone company challenging as unconstitutionally confiscatory an order of the Department of Public Utilities which disallowed rates filed by the company, where this court received additional evidence with respect to known major items of increased expense which would become actual future expenses, the order was remanded to the Department for verification of the increases and appropriate adjustments in its rate decision based on the additional evidence. [74-75]

In a proceeding to determine whether to allow rate increases filed by a telephone company, where a witness for the company testified as to the curtailment in demand which would result from the rate increases but failed to take into account the effect on demand of independent variables other than price, there was no error in the refusal of the Department to make any adjustment for curtailment of demand. [75]

The Department of Public Utilities erred in fixing 12% as the fair rate of return on a telephone company's equity capital, and upon remand for correction of its decision, the Department on all evidence should now allow a return of no less than 13% on the company's equity capital in order to stay above the lowest level of the range of reasonableness and to permit the company to attract new stock capital, and the company must therefore be allowed a rate of return of at least 9.48% on its rate base, rather than the 9% permitted by the Department's order. [75-78]

In a proceeding to determine whether to allow rate increases filed by a telephone company, a decision of the Department of Public Utilities to disallow payments for advice, assistance, and services, made under a license agreement with its parent company, in excess of 1% of the company's gross revenue, on the basis that a certain portion of the charges was not attributed to particular benefits, was arbitrary and not supported by substantial evidence. [78-80]

In a proceeding to determine whether to allow rate increases filed by a telephone company, the Department of Public Utilities erred in disallowing a class of concession service provided by the company to certain of its employees where there was no evidence that the service was abused or resulted in excessive compensation. [80-82]

In a proceeding to determine whether to allow rate increases filed by a telephone company, the Department of Public Utilities erred in rejecting the company's allocation of rates and charges among specific services on the basis that the company failed to provide a cost of service study where the Department's substitution of a uniform percentage increase, with certain exceptions, was arbitrary and unsupported by substantial evidence and where the company was not given any warning as to the Department's disapproval of traditional methods of determining rate structure. [82-85]

On an appeal by an intervener from an order of the Department of Public Utilities refusing to readjust the rates for metropolitan service provided by a telephone company or to order realignments of the service, there was no error in the Department's decision to postpone consideration of the metropolitan rate structure until cost information became available. [85]

Petitions filed in the Supreme Judicial Court for the county of Suffolk on November 14, 1975, and November 26, 1975.

The cases were reserved and reported by *Hennessey,* C.J.

*Robert G. Bleakney, Jr.* (*C. Duane Aldrich & Dennis Tourse* with him) for New England Telephone and Telegraph Company.

*Terence P. O'Malley & Michael Eby,* Assistant Attorneys General, for the Department of Public Utilities.

*Stanley U. Robinson, III,* pro se.

371 Mass. 67 69

New England Telephone & Telegraph Co. *v.* Dept. of Public Utilities.

BRAUCHER, J.   The New England Telephone and Telegraph Company (Company) asserts that the Department of Public Utilities (Department), in regulating its rates, has not taken adequate account of the impact of inflation. In 1974 the Company sought increased annual revenues of $200 million; late in 1975 the Department allowed increases designed to produce $93 million. After argument of this appeal in May, 1976, pending our decision and subject to refund, we granted a stay permitting further increases, designed to produce $60 million. We now hold that the Department's orders are confiscatory, and order the case remanded to the Department. The stay is to remain in force pending final decision by the Department.

1. *History of the litigation.* This is the fourth case brought to us by the Company pursuant to G. L. c. 25, § 5, on appeal from a rate decision of the Department. See *New England Tel. & Tel. Co.* v. *Department of Pub. Util.*, 327 Mass. 81 (1951) (*NET I*); *New England Tel. & Tel. Co.* v. *Department of Pub. Util.*, 331 Mass. 604 (1954) (*NET II*); *New England Tel. & Tel. Co.* v. *Department of Pub. Util.*, 360 Mass. 443 (1971) (*NET III*). See also *Department of Pub. Util.* v. *New England Tel. & Tel. Co.*, 325 Mass. 281 (1950) (mandamus).

The Company filed the tariff revisions now in issue on November 26, 1974, to become effective on December 26, 1974. The revisions were designed to produce additional revenue of $200 million a year by applying nonuniform increases to about 2,000 of the 3,000 items in the tariff — a 27% increase in total Massachusetts intrastate operating revenue. The Department promptly suspended the effective date of the revised tariff for the full ten-month period permitted by statute. G. L. c. 159, § 20, as amended through St. 1973, c. 816, § 1. Public hearings were held on twenty-two days between April 14, 1975, and September 12, 1975.

The Department issued its decision on October 27, 1975, disallowing the revisions filed by the Company. The Company was permitted to file new tariff revisions designed to produce an increase in gross revenues of nearly $93.6 mil-

lion, but the increase was to be applied uniformly to all service classifications and equipment, with specified exceptions. The Company was also directed to prepare a cost of service study. Reserving its right to appeal, the Company filed revised tariffs which were approved and became effective on November 13, 1975. The Company then filed its appeal in the county court and moved for a stay of the Department's orders.

Stanley U. Robinson, III, an intervener before the Department, also appeals. He requested that the Department readjust the rates for metropolitan service and that it order certain realignments in the areas where metropolitan service is offered. The Department ruled that it lacked sufficient cost data to order realignment, and did not except metropolitan service from the uniform permitted increase.

A single justice of this court heard arguments on the Company's motion for stay in January, 1976, and by agreement the appeals of the Company and Robinson were consolidated. In March the stay was denied, with leave to renew the motion before the full court. In April the single justice reserved and reported the case to the full court, specifying the issues to be heard. He included in the record affidavits submitted by the Company in support of the motion for stay; he also included monthly financial reports filed after the report for June, 1975. Those documents had not been presented at the hearings before the Department, and their inclusion was without prejudice to argument whether they were properly included. On June 2, 1976, after argument before the full court, we granted a stay, permitting the Company to submit new revised schedules designed to produce annual gross revenues of $60 million in addition to the revenues produced by the revisions which took effect November 13, 1975, subject to a bond to ensure refunds if the Department's orders are upheld.

2. *Summary of issues; scope of review.* We consider the Company's claims that the decision of the Department is confiscatory or otherwise contrary to law under the fol-

371 Mass. 67                                    71

New England Telephone & Telegraph Co. *v.* Dept. of Public Utilities.

lowing headings: attrition; increased expenses; curtailment of demand; cost of equity capital; license contract payments; concession service; and rate structure. We then consider Robinson's appeal. So far as unconstitutional confiscation is claimed, the Company is entitled to an independent judicial review as to both law and fact; otherwise the standard of review is governed by G. L. c. 30A, § 14 (8). See *NET III*, 360 Mass. at 449.

The Department proceeded, as it has before, on the basis of "an historic test year adjusted for changes occurring within a reasonable time after that period." When the Company's initial evidence was filed in December, 1974, the latest available actual results were for the twelve months ending September 30, 1974; before the record was closed actual financial results were introduced for periods through June 30, 1975, and the Department adopted the twelve months ending June 30, 1975, as the test period. By order of the single justice, results through January, 1976, are included in the record before us.

As urged by the Department, we stand by our prior decisions that the Department, although not required to use a method based on an adjusted historic test year, is permitted to do so. See *NET I*, 327 Mass. at 84; *NET II*, 331 Mass. at 624; *NET III*, 360 Mass. at 452. Cf. *Boston Gas Co.* v. *Department of Pub. Util.*, 368 Mass. 780, 794 (1975); Note, The Use of the Future Test Year in Utility Rate-Making, 52 B.U.L. Rev. 791, 809 (1972). Our "fundamental law requires no particular theory or method to be used in determining a rate base, provided the resulting rates are not confiscatory." *Boston Gas Co.* v. *Department of Pub. Util.*, 367 Mass. 92, 98 (1975). Those decisions, however, do not authorize the Department to ignore confiscatory effects of inflation. See *NET III*, 360 Mass. at 453; cf. *Southbridge Water Supply Co.* v. *Department of Pub. Util.*, 368 Mass. 300, 308 (1975).

Contrary to the Department's request, we also stand by our decisions that additional evidence becoming available after the Department's decision may be considered by us, subject to verification of its accuracy by the De-

partment. *NET III*, 360 Mass. at 448. *Boston Gas Co.* v. *Department of Pub. Util.*, 359 Mass. 292, 300 (1971). Where confiscation or constitutional right is in issue, the authority of the reviewing court must "extend to new evidence necessary to bring the proof as nearly as reasonably possible down to the date of final decision." *Opinion of the Justices*, 328 Mass. 679, 687 (1952). Under G. L. c. 25, § 5, the additional evidence is "to be taken before the commission," but we do not read the statute as requiring a possibly useless remand before we can consider the legal effect of alleged additional evidence. The Department's procedures are already slow enough.

3. *Attrition.* The Department purported to allow the Company a 9% rate of return on a rate base of $1.765 billion. That rate base, however, was determined as the average net intrastate investment of the Company for the "test year" ended June 30, 1975, less items not now challenged. No adjustments in the rate base were made to take account of events after that date. But the rate base grew to $1.826 billion for the twelve months ended December 31, 1975, and to $1.835 billion for the twelve months ended January 31, 1976; and the rates of return, adjusted to include the effect of the November, 1975, rate increase for a full year, were 8.68% and 8.64%, respectively. For the twelve months ending June 30, 1976, the Company projects a return of 8.14% on a rate base of $1.935 billion. If the projection is accurate, the Company's earnings will fall more than $16 million short of the 9% rate of return allowed by the Department.

This is the problem of "attrition," "the tendency of the rate of return to diminish in a period of comparatively high construction costs." *NET II*, 331 Mass. at 622. In times of inflation, as old plant is retired, the new plant built to replace it costs more. If investment increases more rapidly than revenue, the rate of return is diminished. See *Boston Gas Co.* v. *Department of Pub. Util.*, 359 Mass. 292, 307 n.19 (1971).

The Company's state controller presented data to show that there had been steady attrition since 1970. The Department purported to allow a rate of return of 7.80% in

1970, 8.62% and 8.82% in 1972, 8.93% in 1973, and 8.93% in 1974. The actual rates of return for the twelve months following those decisions were 6.96% for the 1970 decision, 6.51% for the 1972 decisions, and 6.80% for the 1973 decision; the Company projected 6.21% for the 1974 decision. Most of the shortfall was attributable to increase in investment. The same witness also made projections for future periods, the latest being the twelve months ending June 30, 1976, and during the hearings actual results became available for some of the periods, showing slightly higher net investment and slightly lower rates of return than he had projected. No witness controverted his testimony, which was based on the Company's reports to the Department.

The Department rejected the use of a future test year "as fraught with speculation and uncertainty," and we uphold that decision on the ground that no particular method is required in determining a rate base. But it is the responsibility of the Department, by some method, to arrive at rates which afford the Company the opportunity to earn a "fair and reasonable return on honestly and prudently invested capital." *Boston Gas Co.* v. *Department of Pub. Util., supra,* 367 Mass. at 97. It is not enough to say, as the Department did, that the attrition suffered by the Company "should be ameliorated by changes in the Company's growth pattern. From December, 1972, through June, 1975, the Company's growth rate in net investment has consistently declined, and even according to the Company's own projections, this decline will continue into the future." In other words, according to the Department, although the Company will continue to earn less than a fair return, the deficiency will be proportionately less in the future than in the past.

Where it is shown, as it has been here, that the Company will not earn the rate of return the Department finds to be proper, some adjustment is required. The Department has been proceeding for years on the assumption that the Company's rate base will remain constant during the period following a decision of the Department. In substance this is an assumption that there will be no infla-

74                                          371 Mass. 67

New England Telephone & Telegraph Co. *v.* Dept. of Public Utilities.

tion. That assumption is not only speculative and uncertain; it is clearly erroneous. It has proved wrong, year after year, and the Department errs when it stubbornly persists in an erroneous assumption. In view of what we say as to cost of equity capital, moreover, it seems clear that the error has resulted in confiscation. See *NET II*, 331 Mass. at 622-623. Contrast *Boston Gas Co.* v. *Department of Pub. Util.*, 368 Mass. 780, 790 (1975).

On remand the Department is to adjust the permitted tariff rates to compensate for the attrition trend indicated by the latest data then available. See *Boston Gas Co.* v. *Department of Pub. Util., supra,* 359 Mass. at 310-311. It may wish to obtain and evaluate further projections to ascertain to what extent the indicated trend will continue. The choice of method to deal with attrition is the Department's, but failure to deal with it is not a permitted option on the record before us. On the Company's projection, it requires more than $16 million additional income after taxes, or more than $34 million additional gross revenue.

4. *Increased expenses.* Just as construction costs and the rate base increase in times of inflation, so operating expenses increase as well. Although the Department used a test year ending June 30, 1975, it adjusted the test year figures for known and measurable changes lying beyond the test year. In particular, adjustments were made for changes in wage rates during 1975, with offsetting adjustments for layoffs and employee attrition. No question is before us as to the propriety of any of these adjustments.

In its motion for a stay, however, the Company asserted that three known major items of increased expense would become actual expenses during 1976: depreciation $5.8 million, fringe benefits $3.3 million, and wages $13.9 million, for a total of $23 million. The higher depreciation rates, retroactive to January 1, 1975, it is claimed, were accepted by the Department the same day it issued its decision in this case; the increases in fringe benefits and wages result from 1974 collective bargaining. Since we hold that the rates permitted are below the line of confiscation, the Department is not free to ignore these increases.

On remand, the Department should verify these increases and make adjustments for them, subject to any proper offsetting adjustments for layoffs and other changes. See *Boston Gas Co.* v. *Department of Pub. Util., supra,* 359 Mass. at 298-301.

5. *Curtailment of demand.* A Company witness testified that the rate increases requested would result in significant curtailment of demand for coin message unit service, intrastate message toll service, noncoin message unit service, and certain supplemental services and equipment, and that increased revenue would therefore be $200 million rather than $216 million. The Department made no adjustment for curtailment of demand because the witness, in the opinion of the Department, took inadequate account of the effect of independent variables other than price, such as changes in average income.

The Department could properly find that the Company did not carry its burden of proof. G. L. c. 159, § 20. The method used by the witness in estimating elasticity of demand is not shown in sufficient detail to permit evaluation. It is common sense that increased price means decreased demand, other factors being equal, but common sense does not disclose the magnitude of the effect. When the effect is projected from the test year to later periods, other factors do not remain equal. Moreover, the service for which demand is most responsive to price seems to be local coin service, and the Department ruled that the rates for that service should remain unchanged.

6. *Cost of equity capital.* The 9% rate of return on the Company's rate base was calculated by the Department as follows:

|  | Proportion of Total Capital | × | Cost Rate | = | Weighted Amount |
|---|---|---|---|---|---|
| Long Term Debt | 45.01% | | 7.04% | | 3.17% |
| Deferred Taxes | 6.45 | | 0.00 | | 0.00 |
| Common Equity | 48.54 | | 12.00 | | 5.83 |
|  | 100.00% | | | | 9.00% |

No issue is now presented as to the capital structure or as to the cost rates for long term debt and deferred taxes. As in previous cases, however, the Company argues that the return allowed on common stock ("common equity" — 12%) is inadequate. See *NET I*, 327 Mass. at 92-96; *NET III*, 360 Mass. at 471-478.

There is no dispute that the return on equity capital must at least equal "the amount which the company would have to pay in order to 'hire' its equity capital under current conditions," but we have recognized that the determination is a "matter of judgment," not "an immutable number." *NET III*, 360 Mass. at 472-474.

Four witnesses testified as to rate of return. Two Company witnesses arrived at conclusions as to the cost of equity ranging from 12.85% to 15.9% by various methods. Two witnesses called by the Attorney General and the Massachusetts Consumers Council arrived at figures ranging from 11.25% to 12.77%. The Attorney General recommended 11.9%, and the Department stated that its conclusion of 12% "closely approximates" the presentations of the latter two witnesses, "which seem to us to better reflect the realities of the present capital market . . . ."

The two witnesses on whom the Department relied both used the "discounted cash flow" method of estimating: a growth factor is added to dividend yield to arrive at an "investor capitalization rate." See *Boston Gas Co.* v. *Department of Pub. Util.*, 359 Mass. 292, 304 (1971). That rate is adjusted so that the Company can realize net proceeds from the sale of new stock equal to the book value of outstanding stock. The adjustment is made by applying a "market-to-book ratio" to the dividend yield to take account of two facts: (1) selling costs must be deducted from selling price to arrive at the net proceeds realized by the Company; (2) a stock offering normally results in a drop in the market price. If new stock yields net proceeds less than book value, the equity of existing stockholders is diluted; and forced dilution is confiscation, at least in the absence of some explanation not present in this case.

The computations made by the two witnesses relied on by the Department resulted in "investor capitalization rates" ranging from 10.3% to 12.33%. One of them used a "market-to-book ratio" of approximately 1.1 to 1 to take account of selling costs, neglecting market pressure. The other used a ratio of 1.05 to 1, but erroneously used data based on market prices after rather than before announcement of a stock issue.

We conclude that a "market-to-book ratio" of 1.2 to 1 is the minimum necessary to compensate the Company adequately for selling costs and market pressure. In other words, the stock must have a market price at least 20% above book value before a new stock issue is announced, or the net proceeds to the Company will be less than book value. Margins of the order of 20% were suggested in our previous cases. See *NET I*, 327 Mass. at 92; *NET II*, 331 Mass. at 617. When the Company offered new stock in 1973, the pre-announcement market price was apparently 20% above the eventual proceeds a share. In 1975 the Company sought to issue new stock by offering rights to existing stockholders. The pre-announcement market price was 20% above the issue price finally set, but the drop in market price during the issue period made the rights worthless, and 30% of the shares offered were not sold.

We agree with the Department when it says, "Well-reasoned judgment must supplement the data and formulae." But the quality of the reasoning is open to examination. The Department's judgment was that a 12% return on book value of $33.28 a share, at a 70% dividend payout ratio, should yield a sufficient amount "to attract capital on reasonable terms, avoid dilution in equity and protect the financial integrity of the Company." If we translate these figures into a dividend yield of 8.4% and a growth rate of 3.6%, there is substantial evidence to support the judgment, but no adjustment is made for the "market-to-book ratio." Application of a 1.2 to 1 ratio to the computations of the two witnesses relied on by the Department produces a range of cost of equity capital from 12.16% to 14%. But the lower end of the range is

78                                              371 Mass. 67

New England Telephone & Telegraph Co. *v.* Dept. of Public Utilities.

contaminated by a wholly incredible growth rate of 1%, used by one of the witnesses, a rate far below the inflation rates which have prevailed for many years.

A cost of equity of at least 13% is supported by the experience of the Company since our decision in *NET III*. We there noted that a stock offering by the Company in September, 1969, had "failed dismally," and we commented that the failure was "an easily identifiable warning signal of stormy financing weather ahead for the Company." 360 Mass. at 477. We then held that 11% was "the lowest level of the range of reasonableness for equity capital." *Id.* at 478. In the period since that decision the Department has allowed further rate increases, but stormy weather has continued. In 1972 the Company sold new stock approximately at book value. In 1973, in a further offering, it set an offer price 14% below book value, and the sale resulted in a 2% reduction in over-all book value a share. Equity financing scheduled for October, 1974, was postponed because the market price had fallen to $21.50, well below book value and perilously close to par value. In the 1975 offering both the pre-announcement price of $27 and the offering price of $22.75 were well below book value, which had declined to $31.87 at the time of the hearings. Cf. *NET III*, 360 Mass. at 472.

We conclude that "the lowest level of the range of reasonableness" of the cost of equity capital is now 13%. This conclusion ignores substantial evidence supporting a higher figure. "It does not follow that a considerably higher return might not fall within the range of reason and might not have been allowed by the department, but our duty is performed by marking the line of confiscation." *NET III*, 360 Mass. at 478, quoting *NET I*, 327 Mass. at 96. The Company must therefore be allowed a rate of return of at least 9.48% on its rate base. On a rate base of $1.935 billion, an increase of 0.48% would require more than $9 million additional income after taxes, or more than $18 million additional gross revenue.

7. *License contract payments.* Like other operating companies in the Bell system, the Company has a license

agreement with the parent company, American Telephone and Telegraph Company (American), under which it pays a fee to American for advice, assistance and services. Since 1930 the agreement has provided for a fee of 2½% of gross earnings, but from 1948 until September 30, 1974, American accepted 1%. These fees have been charged as expenses by the Company, and in the Company's many previous rate cases neither the contract nor the fee has been disapproved.

After a three-year study, American began on October 1, 1974, to allocate and bill to the operating companies on the basis of actual costs, up to the contract rate of 2½%. The allocation has produced charges amounting approximately to 1½%, but the Department disallowed billings in excess of 1% reducing the deficiency in the Company's gross revenue by more than $2 million. The Department said that "there has been no adequate demonstration that such allocated costs are of necessary benefit to the Commonwealth's ratepayers," that a substantial portion is attributable to holding company operations, to regulatory issues and to public relations and employee information, and that "the Company has failed to demonstrate a reasonable relationship between the charges billed under the revised contract and the value of the services to Massachusetts ratepayers."

The Department does not suggest that the license agreement was entered into in bad faith or that there was an abuse of discretion. See *Missouri ex rel. Southwestern Bell Tel. Co.* v. *Public Serv. Comm'n,* 262 U.S. 276, 288-289 (1923). Nor does it argue that the Company does not now benefit from the contract. The Company has the burden of proving the reasonableness of its payments to American. G. L. c. 159, § 34A (*e*), as amended by St. 1974, c. 128. But we think the Department erred insofar as it required that the charges be attributed to particular benefits. American's manager testified without contradiction that specific costs attributable to a particular operating company were allocated to that company, but that most of American's services were for the benefit of all the companies and that

their costs were allocated by formulas based on such factors as amount of plant in service, number of employees, expenses and revenues. The only objection made to the formula is that it is not related to the cost per company or to the value to a particular company.

"The facts that the work is done by a central agency, and that the precise allocation of benefit on the one hand and cost on the other, cannot be apportioned among the respective subsidiaries with mathematical precision, are no good reason for the refusal of a state regulatory authority to refuse to allow a utility under its jurisdiction to contribute, as part of its operating expense, a fair proportion of the cost of maintaining the service." *State ex rel. Pacific Tel. & Tel. Co.* v. *Department of Pub. Serv.,* 19 Wash. 2d 200, 249 (1943). See *Pacific Tel. & Tel. Co.* v. *Flagg,* 189 Ore. 370, 389-395 (1950), and cases cited.

The Department may disallow payments to American which would not be permissible operating expenses if the services were performed and the expenditures made directly by the Company. *Illinois Bell Tel. Co.* v. *Illinois Commerce Comm'n,* 55 Ill. 2d 461, 482-483 (1973). See *Pacific Tel. & Tel. Co.* v. *Public Util. Comm'n,* 62 Cal. 2d 634, 662-663 (1965). But disallowance of payments in excess of 1% of the Company's gross revenue, based on criticism applicable only to an unspecified portion of the payments, is arbitrary and is unsupported by substantial evidence. G. L. c. 30A, § 14 (7), as amended by St. 1973, c. 1114, § 3. Cf. *Salisbury Water Supply Co.* v. *Department of Pub. Util.,* 344 Mass. 716, 718 (1962). On remand, the Department is to allow as expenses the cost of the contract services as allocated by the formulas, except for amounts disallowed as unreasonable or otherwise improper.

8. *Concession service.* "Concession service" is free or reduced rate telephone service provided by the Company to its active and retired employees. Class A service, available to management employees, to employees with more than thirty years of service, and to all retired employees, consists of free main telephone service, including one or two extension telephones, free toll service within the con-

tinental United States up to about $25 a month, and a 50% reduction in charges for certain equipment. Class B service, available to all other employees with six months' service, involves a 50% concession for exchange service, for toll service within New England, and for certain equipment. Class A service amounts to about $27.50 a month, an annual total of over $5 million; Class B service to about $7 a month, an annual total of over $2 million.

The record of a 1973 investigation concerning concession service was incorporated by reference in the present record. On the basis of that record, the Department disallowed Class A service, increasing the gross revenue attributed to the Company for the test year by nearly $3 million. It said that "it is unreasonable for the Company's customers to bear the cost of providing full Class A concession service to the Company's employees. It has not been demonstrated that the ratepayers receive any greater benefit from employees who receive Class A concession service than from those who receive Class B concession service. Moreover, many persons who now receive Class A concession service are the Company's more highly paid employees, and there appears to be no reason for them to be subsidized to the extent of full concession service by the ratepayers. In these times, the Company's customers can ill afford such beneficence."

Common carriers are forbidden to give free service by G. L. c. 159, § 15, but that section does not "prohibit any common carrier from giving free or reduced rate service to its employees." It is not contended that retired employees are not "employees" within the meaning of the quoted language. Cf. G. L. c. 160, § 200. We therefore do not consider that question. Mass. R. A. P. 16 (a) (4), 367 Mass. 919 (1975).

Concession service is viewed by the Company and its employees as a form of compensation. With respect to executive compensation and benefits, the Department said that the matter "would appear to fall within the scope of management judgment with which we are prohibited from interfering, unless such judgment is exercised in an unrea-

sonable and improper manner." See *NET III*, 360 Mass. at 484, 489. We agree, and we think the principle is equally applicable to concession service. There was no evidence that the service was abused. Cf. *Kearl* v. *Swan Creek Elec. Co.*, 13 P.U.R. 3d 137, 142-143 (Utah Pub. Serv. Comm'n 1956). Nor was there evidence to support a finding that the Class A service resulted in excessive compensation.

We conclude that the adjustment to test year revenue for Class A concession service was improper. On remand the Department is to eliminate the adjustment.

9. *Rate structure.* The rate increases proposed in the tariff schedule filed by the Company in November, 1974, were not uniform. The increases applied to about 2,000 of the 3,000 items in the tariff, and the percentage of increase varied widely. The initial coin telephone fee, which has been ten cents since 1953, was to be increased 100% to twenty cents, but the new tariff was designed to approximate a 30% increase for each category of service. The new rates reflected reliance on the "relative value" to customers of one service as compared to another, and on the over-all costs of running the intrastate business, but the Company took the view that "to attempt to define the costs or the precise costs of all of the individual services that are provided in the State of Massachusetts is an impossible task."

The Department was "distressed that the Company has failed to provide cost information regarding the individual services it provides." In the Department's view, "serious consideration cannot be given to the Company's rate structure without more detailed cost information than has been supplied in this case." The "value of service" standard, standing alone, was said to be "plainly insufficient" as a basis for rate setting. The Department therefore saw "no alternative but to order the Company to obtain the additional revenue we have found reasonable by means of a uniform percentage increase to be applied to all service classifications and equipment items."

Four exceptions were made: the increase was not to apply to coin operated telephone service, measured resi-

New England Telephone & Telegraph Co. *v*. Dept. of Public Utilities.

dential service, or flat rate two or four party residential service. The exception for coin telephone service was rested on deficiencies in cost information, "the value to the public of a relatively inexpensive coin telephone service ... particularly in emergency situations," and the "important social value" of the "accessibility of telephone service initiated by a single dime." The other three exceptions were justified on the basis of "administrative discretion" in the absence of detailed cost information.

The rates which finally took effect in November, 1975, reflected a uniform increase of 15.2% applicable to the 2,000 items for which increases had originally been proposed, subject to the four exceptions. The Company was also ordered to prepare a cost of service study in accordance with stated guidelines. The Company does not now contest specific rates such as the ten cent initial coin telephone fee, nor does it attack the order for a cost of service study. It stands on the proposition that allocation of rates and charges among specific services is a management prerogative in the absence of a showing of unjust discrimination. In particular, it claims that rejection of its proposed rate structure because of lack of a cost study is not supported by findings that such a study is feasible, that its cost would be reasonable in relation to benefits, or indeed that there would be any benefits.

We agree with the Company that our statutes contemplate a rate schedule initially devised by the Company. G. L. c. 159, § 19. Moreover, the Department may not suspend such a schedule "for a longer period than ten months in the aggregate." G. L. c. 159, § 20, as amended by St. 1973, c. 816, § 1. It may "determine" and "fix" rates only if it "shall be of opinion," after hearing, that the rates or the regulations or practices affecting them are "unjust, unreasonable, unjustly discriminatory, unduly preferential, in any wise in violation of any provision of law, or insufficient to yield reasonable compensation for the service rendered." G. L. c. 159, § 14.

For years the Department has accepted rates based on a "value of service" standard. In the decision now under re-

view it suggested that the Company may have been "lulled by the rather ambivalent position taken by the Department on this subject in the past." It said it "will immediately seek to remedy" the past tradition of "regulatory indecision." We do not think our statutes foreclose such attempts to improve the regulatory process. Cf. *Liberty Mut. Ins. Co.* v. *Commissioner of Ins.,* 366 Mass. 35, 44-45 (1974); *Wilson & Co.* v. *United States,* 335 F.2d 788, 800 (7th Cir. 1964), remanded on other grounds, 382 U.S. 454 (1966). But such attempts are not to be used to extend the ten-month maximum period of suspension. Cf. *Boston Gas Co.* v. *Department of Pub. Util.,* 368 Mass. 51, 57 (1975); *Nader* v. *FCC,* 520 F.2d 182, 188-191 (D.C. Cir. 1975). When a major change in the regulatory standard is in prospect, there should ordinarily be warning sufficient to enable the Company to adjust both its practices and its proof to the new situation. Cf. *Boston Gas Co.* v. *Department of Pub. Util.,* 368 Mass. 780, 802-803 (1975). It is apparent that there was no such warning here.

There is no finding that the Company did not sufficiently justify its proposed rate structure under the standards traditionally followed by the Department. Moreover, there is no finding that the application of a uniform percentage increase to 2,000 of the 3,000 items in the tariff, with four exceptions, produces rates which are "just and reasonable" under any stated criteria. See G. L. c. 30A, § 11 (8); cf. *New York Cent. R.R.* v. *Department of Pub. Util.,* 347 Mass. 586, 593 (1964). Within a substantial range the question what rates to charge is a matter for the Company's determination. Cf. *Boston Gas Co.* v. *Department of Pub. Util.,* 359 Mass. 292, 301 (1971); *Department of Pub. Util.* v. *New England Tel. & Tel. Co.,* 325 Mass. 281, 289 (1950). In the circumstances the Department's substitution of its own rate structure for that of the Company's was arbitrary and unsupported by substantial evidence. G. L. c. 30A, § 14 (7). Cf. *Nader* v. *FCC, supra,* 520 F.2d at 190. Contrast *Boston Gas Co.* v. *Department of Pub. Util.,* 368 Mass. 780, 804 (1975).

Thus we hold that the Department may not, in the pres-

ent case, disapprove the rate for any particular service on the ground that the Company has supplied insufficient data as to the cost of that service. Nor may it reach the same result on the basis of "administrative discretion" supported only by the absence of cost information. It may, however, disapprove a particular rate for other reasons. See *Donham* v. *Public Serv. Comm'rs*, 232 Mass. 309, 324-325 (1919). In particular, the Department's ruling as to the initial coin telephone fee rested on the "important social value" of the ten cent fee as well as on deficiencies in cost information. We have the uncomfortable feeling that in 1953 the three cent stamp had an "important social value" similar to the value of the ten cent telephone call, but since the point has not been argued separately, we do not pursue it. On remand the Department is to reconsider that ruling, together with its other rulings on rate structure, and is to provide more complete subsidiary findings to support any changes it orders in the structure proposed by the Company.

10. *Robinson's appeal.* "Metropolitan service" enables the subscriber to call telephones in a large number of exchanges in the Boston metropolitan area, toll-free. Robinson, a resident of the outer ring of this area, Zone III, claims that he pays more for the privilege of calling fewer telephones than those in Zone II pay for the privilege of calling more telephones. The Department rejected his contention on two grounds: the absence of cost information, and lack of sufficient information "to resolve the many geographic concerns." Robinson's argument largely rests on "value of service," and the Department has initiated a shift to "cost of service." The Department has wide discretion in choosing its approach to rate regulation. See *NET III*, 360 Mass. at 453. We think it could properly postpone consideration of the metropolitan rate structure until cost data become available. Cf. *FPC* v. *Tennessee Gas Transmission Co.*, 371 U.S. 145, 148-150, 153-154 (1962).

11. *Recapitulation.* Our decision involves roughly the following amounts of needed additional gross revenue, rounded to the nearest million dollars. The amounts for

attrition and for cost of equity capital relate to net revenue after taxes, and have been adjusted to show the gross revenue needed. Several of the items may be overstated, since we have relied on data subject to evaluation by the Department and have left offsetting adjustments to the Department. On the other hand, as to some items we have sought only to mark the line of confiscation, leaving it to the Department to decide whether some additional leeway may be appropriate.

|                               |              |
| ----------------------------- | ------------ |
| Attrition                     | $34 million  |
| Increased expenses            | 23           |
| Cost of equity capital        | 18           |
| License contract payments     | 2            |
| Concession service            | 3            |
| Total                         | $80 million  |

12. *Disposition.* The case is remanded to the county court. There an order is to be entered directing further consideration and decision by the Department in light of this opinion and further report of its action thereon by the Department to the county court. The stay heretofore granted is to remain in effect until further order of the county court.

*So ordered.*