**COMMONWEALTH**
vs.
**Richard WAITHE**

Nos. 4241, 4242

Superior Court/Essex, ss.
Commonwealth of Massachusetts

**February 10, 1983**

**George O'Connor,** counsel for plaintiff.
**Larry McGuire,** counsel for defendant.

## FINDINGS, RULINGS AND ORDER ON DEFENDANT RICHARD WAITHE'S MOTION TO SUPPRESS EVIDENCE

### Introduction

By his Motion to Suppress Evidence, "The defendant moves that this Honorable Court suppress as evidence against him all physical evidence seized and all statements obtained from him by officers of the Methuen Police Department and the Federal Government, on or about August 27, 1981, and all evidence that was derived, directly or indirectly therefrom." At the hearing on his motion, defendant did not offer any evidence of statements he may have made to officers either of the Methuen Police Department or of the Federal Government which he indicated he was seeking to suppress. Rather, defendant in fact seeks to suppress exemplars of his handwriting which he provided to United States Postal Inspectors on September 16, 1981. In support of his motion, which has attached thereto an affidavit, defendant indicates on the face thereof "as reasons therefor, the defendant states that the seizure was made without a warrant, after an arrest made without probable cause, in the absence of counsel at a time when his right to representation has attached, all in violation of the Forth, Fifth, Sixth and Fourteenth Amendments to the United States and Articles XII and XIV of the Massachusetts Declaration of Rights." At the conclusion of the evidentiary hearing conducted on the motion, defendant orally argued both that his arrest was made without probable cause and that any information he provided to law enforcement authorities after his arrest should be suppressed irrespective when made, and also that he was denied effective assistance of counsel when he provided exemplars of his handwriting to United States Postal Inspectors.

Defendant has been indicted for the offenses of extortion and of receiving stolen property.

### Findings of Fact

After an evidentiary hearing on defendant's motion, from the evidence by way of testimony, exhibits and inferences therefrom, I find the facts relevant and material to the relief sought by defendant in his motion as follows. Counsel indicated by way of background immediately before the hearing that sometime before July, 1981 the home of one Richard Paduchowski (the victim) had been broken into and quantities of film and albums containing photographs were stolen from the home. Shortly after the victim's home had been broken into, he began to receive telephone calls from persons who indicated that they possessed the film and photographs taken from his home.

In July, 1981, United States Postal Inspector James Burke met with the victim at the Methuen Police Station. The victim indicated to Burke that he was receiving telephone calls and demands for money for return of the stolen film and photographs from a person who identified himself as Tony. Thereafter the police made tape recordings of subsequent telephone calls from Tony who continued to demand money for return of the film and photographs. At some time thereafter, a Detective Rayno of the Methuen Police Department listened to the tape recordings made of telephone calls to the victim from Tony and Rayno recognized the voice of the person who identified himself as Tony but he was then unable to associate mentally a name with that voice.

On August 27, 1981, by prearrangement, Burke went to the victim's home and early that morning the victim received another telephone call from Tony. The victim agreed on request to meet Tony at the Methuen Mall. The victim informed Burke of that conversation. Coincidentally, at about the time the victim was speaking with Tony on his telephone, Officer John Lorenzo of the Methuen Police Department was on duty patrolling in a marked police cruiser in the smaller mall adjacent to the Methuen Mall. He observed defendant, who was and is

known to him, as well as a Peter Parrino, who was and is also known to him, on the sidewalk outside of the smaller mall. At that time Parrino appeared to be using a pay telephone, with defendant standing nearby. Lorenzo pulled up and engaged defendant and Parrino in conversation for approximately 10 to 15 minutes. A green-colored Cadillac was parked nearby. After his conversation with defendant and Parrino, Lorenzo resumed his patrol and later returned to the Methuen Police Station arriving there at about 8 to 8:20 a.m. and where he happened to speak with defendant's brother who is a Methuen Police Officer. With Detective Rayno nearby, Lorenzo indicated to defendant's brother that he had just observed his brother, defendant, with Parrino at the smaller mall adjacent to the Methuen Mall.

Detective Rayno overheard Lorenzo's statement to defendant's brother. Rayno had just finished listening to another tape of a conversation between the victim and Tony, the extortionist. At that point Rayno exclaimed, "I know who it is now, it is Peter Parrino." It seems that Detective Rayno had known both defendant and Parrino for approximately 20 years. Detective Rayno then went to a drawer containing photographs, removed photographs of defendant and Parrino and gave them to postal inspectors who were standing by at the Methuen Police Station. Detective Rayno had observed defendant in the past operate a green-colored Cadillac owned by Parrino and he so informed the postal inspectors.

After the victim had received the telephone call from the extortionist Tony, he and Postal Inspector Burke left the victim's home and went to the Methuen Police Station and was present when Rayno identified the extortionist Tony from a tape recording as Parrino.

Rayno and Burke then left for the Mall in a van. The victim proceeded there in his own automobile. A Postal Inspector John Burns, who had been at the Methuen Police Station to participate in a surveillance of the Mall and who was provided with a photograph of defendant and given a description of the green-colored Cadillac owned by Parrino and often driven by defendant, also repaired to the Mall and when he arrived, he engaged in surveillance.

When Burke arrived at the Mall, he observed a green-colored Cadillac and he parked about 35 yards away. Burke then left the van, went to the entrance of a Sears garage situated at the Mall, and from the vantage point observed the victim arrive in his automobile and park. Burke first observed Parrino approach the victim's automobile and he then observed Parrino and the victim engage in conversation. Parrino then entered the victim's automobile which was then driven to another location near where the green-colored Cadillac had been parked and then to near where the film and photographs stolen from the victim's home had been stashed. The victim's automobile was stopped by postal inspectors who converged on it shortly before it was about to leave the Methuen Mall. Parrino was then arrested.

When Detective Rayno arrived at the Mall, he proceeded to and entered a van where postal inspectors were conducting a surveillance. Rayno first observed a green-colored Cadillac occupied by both defendant and Parrino facing the Sears garage. At about 11:00 a.m. Rayno observed the victim arrive in his automobile and park. Shortly thereafter, Rayno observed Parrino depart the Cadillac, climb over a guard railing, walk down an embankment and approach the victim's automobile, enter it and it was then driven off. After Parrino entered the victim's automobile and after it was driven off, the green-colored Cadillac was also driven off.

All of the Methuen Police and postal inspectors who had been involved in the surveillance at the Mall and in the arrest of Parrino lost sight of the green-colored Cadillac after it had driven off. Inspector Burns had observed defendant in the Cadillac leaving the Mall via a service road. Burns then lost sight of the

Cadillac. Approximately five minutes later, Burns again observed defendant driving the Cadillac on the same service road entering the Mall. Burns next observed the defendant on the same service road going into the Methuen Mall. Burns then received radio communication and he then began to search for the Cadillac. After Burns circled in front of the Mall, he observed defendant standing in front of the Sears garage. At that point Burns picked up Rayno and returned to where he had observed defendant who had remained standing in front of the Sears garage. Burns stopped his vehicle in front of defendant and both he and Rayno alighted from their vehicle. Rayno then engaged defendant in conversation. Rayno, after saying, ''Hi'', asked defendant what he was doing there. Defendant immediately informed Rayno that he, defendant, had driven Parrino at his request to meet a person at the Mall and once there Parrino had asked him to come back ''in a little while.'' Defendant stated that he had been driving around and ''looking for women.'' Rayno then asked defendant where the Cadillac was and defendant informed Detective Rayno of the Cadillac's location. Rayno then drove defendant and Inspector Burns to where the Cadillac was located and asked defendant if, Rayno, had permission to search the automobile. Rayno provided **Miranda** warnings to defendant who said, ''No problem.'' Rayno then searched the Cadillac with negative results. Rayno then asked defendant to accompany him to the Methuen Police Station and defendant indicated he would. Rayno was not present when defendant was interviewed by the postal inspectors at the Methuen Police Station.

After defendant, Rayno and the postal inspectors arrived back at the Methuen Police Station, defendant was questioned by Inspectors Burns and Burke and an Inspector Dunn in a room at the Station. Defendant again was provided with **Miranda** warnings which he understood. Defendant was asked about the activities he had engaged in from the time when he had first met Parrino that morning until 11:00 a.m. later that morning. Defendant indicated that he had absolutely no knowledge of Parrino's attempted extortion of the victim and he related all of his activities with Parrino including having breakfast and snacks together at different restaurants. Defendant indicated that Parrino had asked him to drop him off at the Methuen Mall where he, Parrino, had to meet someone and to return in 20 minutes. When asked by Burns whether or not he had observed anything in Parrino's hand that morning, defendant responded that he had not.

After more questioning of defendant and after extensive telephone discussions with the U.S. Attorney's Office in Boston and after speaking with an Assistant U.S. Attorney, Burke took defendant into custody and transported him to the United States Court House in Boston. Upon arriving there defendant was brought to a United States Magistrate's courtroom where the Magistrate read charges to the defendant, asked if he, defendant, had legal counsel, set bail and provided **Miranda** warnings to defendant. Defendant was then released on his own recognizance. The Magistrate scheduled a probable cause hearing for September 16th.

On September 16th, at about 11:00 a.m., Burke observed defendant and Parrino in the Magistrate's courtroom apparently waiting for the scheduled probable cause hearing to commence. Both defendant and Parrino had been expected to appear accompanied by legal counsel and when it was learned they were not, the Magistrate indicated that he would appoint legal counsel and defendant and Parrino's cases were continued to another date.

Burke had served both defendant and Parrino in the courtroom with a Grand Jury subpoena to appear before a Grand Jury at 3:00 p.m. that afternoon. Burke's service of the subpoenas may have occurred either before or after the hearing before the Magistrate that morning. Inspector Burke cannot recall when.

When defendant was served by Burke with the Grand Jury subpoena, at defendant's request, Burke explained that he, defendant, would have to testify before the Grand Jury at 3:00 p.m. that afternoon at which time he, Burke, would seek to have the Grand Jury require defendant to provide exemplars of his handwriting. Burke then asked defendant if he had read the subpoena, which is not in evidence and which purportedly sets out some form of warnings, and defendant responded that he had and that he also had some questions. Burke explained to defendant that he was not required to provide exemplars and if he declined to do so he, Burke, would appear before the Grand Jury seeking to have it order defendant to provide the exemplars. Burke explained further that if defendant continued to refuse to provide the exemplars a judicial hearing would be held at which he, Burke, would request the judge to order defendant to provide the exemplars. Burke then asked defendant if he understood, and defendant indicated that he did and "that he had nothing to worry about." Burke did not inform defendant that he had a "right to counsel" at a judicial hearing to enforce a Grand Jury order to defendant to provide exemplars of his handwriting. Both defendant and Parrino then provided exemplars of their handwriting to Burke. Parrino was present while Burke was speaking with defendant; in fact, Burke was directing his comments to Parrino as well.

Burke testified that he took defendant into custody at the Methuen Police Station on August 27th because (1) defendant had been seen driving in the area of the Methuen Mall on two occasions in an automobile owned by Parrino; (2) defendant had been seen nearby at a pay telephone where Parrino was observed making a telephone call and the call made on August 27th to the victim was traced to that telephone; (3) Parrino was dropped off by defendant at a rise near where the victim appeared later; and (4) because defendant had been with Parrino the entire morning, the film and the photographs were in a very bulky package and defendant should have observed those items in Parrino's possession which he denied. Burke had concluded in his own mind that the film and photographs could not have been stashed other than that morning because they were in a very visible location where they would have been scooped up.

**Rulings of Law**

Counsel for defendant argues that there was no probable cause to arrest defendant and if there was no probable cause all evidence gathered afterwards, including the taking of the exemplars, was tainted and should be excluded. He argues also that defendant was not sufficiently advised of his rights prior to his providing the exemplars and therefore he was deprived of his right to counsel. Counsel for the Commonwealth argues that not only was there sufficient probable cause to arrest defendant but that the defendant was provided with more tham ample warnings prior to making the exemplars at Burke's request.

It has been decided definitively by the Supreme Judicial Court that the taking of handwriting exemplars in the absence of counsel does not amount to a deprivation of constitutional rights and therefore the question of waiver is irrelevant. **Gilbert v. California,** 388 U.S. 263, 265 (1967). There can be no question that the rights of defendant in this matter were not violated and that the evidence of his handwriting exemplars should not be suppressed on this ground.

The only question, then, is whether the exemplar evidence is the result of illegal action by the police. Specifically, the issue is whether probable cause existed to arrest defendant, and if not, was the evidence sought to be excluded "tainted" by the illegal arrest.

In general, probable cause to arrest exists where the facts and circumstances in the arresting officer's knowledge are sufficient to warrant a person of reasonable caution in believing that an offense has been committed. **U.S. v.**

**Klein,** 522 F.2d 296, (1st Cir. 1975). It is not grounds for arrest that a person is in the company of one known to have committed a crime. **U.S. v. Edwards,** 443 F. Supp. 192 (D.C. Mass. 1977); **Comm v. Diring,** 354 Mass. 523 (1968).

However, the officer here did not arrest defendant merely because, at the time of his arrest, he was with a person known to have committed a crime. Defendant was known to have been in the company of Parrino at crucial times when the crime was actually being committed. Farthermore, the officer had reason to believe that defendant was lying about facts pertinent to the crime. See **Comm. v. Carrion,** 370 Mass. 408 (1976) (probable cause found where accused gave false names for victims and his story did not match his brother's). It has been held that,

> "Ordinarily, when trustworthy evidence makes it clear that an offense has been committed and that a particular person was on the scene at the time it was committed, and the then available evidence makes it reasonable to infer that the particular person not necessarily was, but may have been one of the offenders, most discrete and prudent men would order that person's arrest."

**U.S. v. Cooperstein,** 221 F. Supp. 522 (D.C. Mass. 1963).

In this case it is reasonable to infer from defendant's friendship with Parrino, from his presence at times and places when Parrino was committing the offense, from his actions which appeared to facilitate the commission of that offense and the reasonable deduction that statements he made were lies, that defendant was involved in the crime.

Assuming **arguendo,** that the arrest was illegal, there is no question that evidence obtained after the arrest is not inadmissible **per se.** The factors relevant to the issue of whether evidence obtained after an illegal arrest is sufficiently tainted to mandate suppression are listed in a recent case.

"(1) **Miranda** warnings, (2) the temporal proximity of the arrest and the confession, (3) the presence of intervening circumstances, and (4) the purpose and flagrancy of the official misconduct." **Comm v. Bradshaw,** 385 Mass. 244, 258 (1982), citing **Brown v. Illinois,** 422 U.S. 590, 603 (1975).

The evidence sought to be suppressed in this case was gathered twenty days after the arrest. There were several intervening circumstances, including the service of the Grand Jury subpoena on defendant, which make the causal connection between the arrest and the giving of evidence extremely attenuated. The arrest was made in good faith and defendant was not subjected to any unusual pressure by the police. On all these points, this case compares favorably with other cases in which statements made to the police following an illegal arrest were found admissible. **Comm. v. Bradshaw,** 385 Mass. 244 (1982); **Comm v. Tisserand,** 5 Mass. App. Ct. 383 (1977); **Comm. v. Fielding,** 371 Mass. 77 (1976). No issue of **Miranda** rights is involved here since they do not attach to handwriting exemplars. **Gilbert v. California, supra,** p. 265.

## ORDER

Therefore, defendant's Motion to Suppress is hereby **denied.**

**Paul G. Garrity**
**Justice of the Superior Court**