FITCHBURG GAS AND ELECTRIC LIGHT COMPANY *vs.* DEPARTMENT OF PUBLIC UTILITIES.

Suffolk. April 4, 1978. — June 30, 1978.

Present: HENNESSEY, C.J., BRAUCHER, KAPLAN, WILKINS, & LIACOS, JJ.

*Public Utilities*, Rate base costs. *Practice, Civil*, Review of order of department of public utilities. *Due Process of Law*, Public utilities.

In a rate proceeding respecting a utility company, exclusion of the unamortized portion of retired property from rate base was justified and did not have a confiscatory effect. [574-577]

In a rate setting proceeding, a decision of the Department of Public Utilities to exclude from rate base as unused and unuseful to ratepayers an electric generating plant kept on standby for emergency service was made with fair notice to the company and was supported by substantial evidence. [578-583]

In a rate setting proceeding a decision of the Department of Public Utilities to normalize an allowed amortization expense on an electric generating plant which was to be retired by approximating future tax benefits associated with the retirement, was unsupported by the evidence. [583-584]

Where in a rate proceeding there was undisputed evidence that a utility company paid its property tax on a fixed base pursuant to a tax case settlement and that the tax would not be reduced by the retirement of a generating plant, the Department of Public Utilities erred in adjusting the company's property tax expense by an amount allocated to the plant. [584-585]

Where a rate setting proceeding respecting a utility company was to be remanded to the Department of Public Utilities for other reasons, this court afforded the company an opportunity on remand to supply a reasonable estimate of what portion of a figure asserted by the com-

pany in the proceeding to represent the expense of operating a particular plant to be retired would not in fact be saved by the retirement. [585]

In a rate setting proceeding, a decision of the Department of Public Utilities to calculate the company's short-term debt at a level equal to an average of short-term debt during the test year and to take full account of the company's long-term debt, incurred toward the end of the test year but continuing during the future period for which rates were being set, was reasonable and supported by substantial evidence. [585-586]

In a rate setting proceeding the Department of Public Utilities did not err in ordering that certain property retired by the company be given "abnormal" abandoned property treatment and that the company bring its books into conformity with the decision beginning with the test year where the order merely implemented the department's decision in a prior rate case and was not retroactive. [586-587]

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on September 15, 1977.

The case was reported by *Kaplan*, J.

*Gerard A. Maher* of New York (*Richard L. Brickley* with him) for Fitchburg Gas and Electric Light Company.

*John F. Hurley*, Assistant Attorney General, for the Department of Public Utilities.

BRAUCHER, J.   The Fitchburg Gas and Electric Light Company (Company) asserts that the Department of Public Utilities (Department), in regulating its rates, has improperly excluded from the rate base an electric generating unit known as Unit 6, and that the Department's order is confiscatory. In February, 1977, the Company sought $2,795,000 in increased annual electric revenues and $838,000 in increased annual gas revenues. Effective August 31, 1977, the Department allowed increases designed to produce $1,060,185 in additional annual electric revenues and $553,734 in additional annual gas revenues. A single justice of this court granted a stay, pending our decision and subject to refund, permitting further increases designed to produce $472,831 additional annual revenues.

We now reject the Company's claim of confiscation and uphold the exclusion of Unit 6 from the rate base. We also find no error in the Department's calculation of the Com-

375 Mass. 571 573

Fitchburg Gas & Electric Light Co. v. Department of Public Utilities.

pany's projected debt or in the Department's order that certain retired property be given abnormal abandoned property treatment. But we hold that the Department erred in calculating expense saving from the retirement of Unit 6 and in treating the amortization expense of the retirement as a tax deduction. The case is to be remanded to the Department. The stay is to remain in force pending final decision by the Department.

1. *History of the litigation.* The issues in this case arise in part out of two prior cases. In D.P.U. 18031-A (July 15, 1975), the Company had retired certain property and the Department excluded that property from the Company's rate base. The Company appealed to this court, and argued that the Department's policy of excluding the unamortized portion of abandoned property from rate base was erroneous. The Company further argued that even if the Department's policy was legal in general, it was illegal when applied to the Company in that case since it had the effect of producing an effective rate of return which was confiscatory or otherwise illegal. We rejected both arguments, but we noted that the Company could reopen the issue of the adequacy of its effective rate of return by filing a new rate application. *Fitchburg Gas & Elec. Light Co.* v. *Department of Pub. Utils.*, 371 Mass. 881, 889 & n.15, 890 (1977) (*Fitchburg I*).

In D.P.U. 18296 and 18297 (December 31, 1975), the Department found that a prima facie case had been made that an electric generating unit owned by the Company, known as Unit 6, was "excess capacity, the elimination of which may be made without significant effect on service to customers." The Department stated, "If the Company is convinced that retention of the plant is in the best interests of its customers, it should be prepared in its next rate case to present a detailed economic justification for its continuation in service." The Company appealed the Department's decision but subsequently abandoned the appeal.

In the present case (D.P.U. 19084, August 31, 1977), the Company was unable to convince the Department that the

retention of Unit 6 was justified. It was also unable to convince the Department to include in rate base either the unamortized portion of Unit 6 or the unamortized portions of the Company's other retired properties. The Company now brings an appeal to us pursuant to G. L. c. 25, § 5, and seeks to relitigate the issue of the adequacy of its effective rate of return. It also argues that the exclusion of Unit 6, and certain other decisions by the Department, are not supported by substantial evidence.

2. *Confiscation.* In general, review of a decision by the Department is governed by G. L. c. 30A, § 14 (7). The Company, however, is claiming that the Department's decision has resulted in confiscation. "So far as unconstitutional confiscation is claimed, the Company is entitled to an independent judicial review as to both law and fact; . . . ." *New England Tel. & Tel. Co.* v. *Department of Pub. Utils.*, 371 Mass. 67, 71 (1976).

We rule elsewhere in this opinion that the Department's decisions excluding Unit 6 from the rate base, projecting the Company's debt at a level higher than the Company argued for, and giving certain retired property abnormal abandoned property treatment, are supported by substantial evidence. The Company argues that it is entitled to independent judicial review of those decisions, since, if wrongly decided, they might result in confiscation. We disagree. As we have indicated in prior decisions, we review such Department findings, though subsidiary to a confiscation claim, only to determine whether they are supported by substantial evidence and otherwise meet the standards of G. L. c. 30A, § 14 (7). See *Boston Edison Co.* v. *Department of Pub. Utils., ante,* 1, 9-11, 17 (1978) (*Boston Edison*); *Fitchburg I, supra* at 885 n.7. Cf. *Zussman* v. *Rent Control Bd. of Brookline,* 371 Mass. 632, 642 (1976) (Wilkins, J., concurring).

The Company does not contest the Department's choice of 13% as its rate of return on common stock. Nor does it challenge the Department's general policy of excluding unamortized abandoned property from the rate base. But it

375 Mass. 571                                      575

Fitchburg Gas & Electric Light Co. v. Department of Public Utilities.

argues that the effect of excluding from rate base the un-amortized portion of Unit 6 and the unamortized portions of certain other retired properties, together with several other asserted errors by the Department, is a confiscatory effective rate of return. The Company argues that, in contrast to its allowed rate of return on common stock of 13%, its effective rate of return will be only 7.2%. The Company computes the "effective rate of return" on a base of "common stock" as of December 31, 1976, as reported in the Department's decision. The base figure used takes retired property into account. The allowed rate of return is computed only on the allowed rate base.

A confiscation claim is not made out by showing that the effective rate of return will be less than the allowed rate of return. The Company has previously so argued, and we rejected its argument in *Fitchburg I, supra* at 889. We there approved the Department's policy of dividing the burdens caused by premature retirement of facilities between investors and ratepayers, "by requiring that consumers absorb the costs of useless property" through amortization, but limiting "the burden on consumers by requiring that stockholders forgo a return on unused property" (footnote omitted). *Id.* at 883. Inherent in this policy is the possibility that a company's effective rate of return will be less than its allowed rate of return. Such a result is not a constitutional violation. The due process clause "never has been held . . . to require a commission to fix rates . . . on an investment after it has vanished, even if once prudently made . . . . The due process clause has been applied to prevent governmental destruction of existing economic values. It has not and cannot be applied to insure values or to restore values that have been lost by the operation of economic forces." *Market St. Ry. v. Railroad Comm'n*, 324 U.S. 548, 567 (1945). The Company is entitled to a rate of return only on its "used or useful" rate base. See *Boston Edison, supra* at 21.

In addition, the Company's computation of its effective rate of return is faulty. The Company's analysis erroneously

treats amortization as an actual current expense and therefore fails to take account of the funds it will be permitted to receive for the amortization of the properties it is retiring. These funds will reduce the Company's losses due to the reduction of its rate base. Indeed, in the short run at least, the Company's cash flow due to amortization may outweigh its losses due to reduction in rate base. Thus the asserted 7.2% return does not fairly reflect the financial impact on common stockholders.

Although a company is not entitled to a return on unused property, it is possible that even justified exclusions from rate base could seriously damage a company. We have recognized that a justified exclusion from rate base could be confiscatory in effect or at least could constitute an error of law. See *Boston Edison, supra* at 21; *Fitchburg I* at 885. There might be an "unusual circumstance" justifying a departure from the usual rule that unamortized retired property need not be included in rate base. Cf. *Southbridge Water Supply Co.* v. *Department of Pub. Utils.*, 368 Mass. 300, 305-306 (1975); *Boston Gas Co.* v. *Department of Pub. Utils.*, 367 Mass. 92, 101-104 (1975). When an exclusion from rate base is accompanied by the allowance of amortization over a reasonable period, as it was here, it is unlikely that the exclusion will have what we have called a confiscatory effect. We have examined the Company's contentions, and it has not come close to showing that there are unusual circumstances here.

The Company argues that it had only a 9% rate of return during the test year. "Continuation of operating results even at that level," the Company says, "would so dilute Fitchburg's common stock that annual issues of stock would be required for the next eight years, would decrease the common stock dividend from the present $1.44 per share to $1.04, and would drive the price of the stock down from the current market price of $16.50 to $11.50, or 65% of its book value." But some loss resulting from a justified exclusion from rate base is to be expected, and the Company has not shown that its losses will be unusual or that they will have

extreme consequences. Moreover, any projection of the future market for the Company's stock must take account of the funds allowed to be generated for amortization of retired plant and the possible use of such funds to retire debt.

The Company further argues that its most recent stock offering was a "failure," by which it means, apparently, that the stock could only be sold at a discount of 50% below book value. But there is evidence in the record that the market price of the Company's shares at the time of the offering in 1974 was only about one-half the market price at the time of the Department's hearing. As the Department points out, in its brief, "Obviously, external forces in mid-1974, most notably the Arab oil embargo, rather than prior rate decisions of the Department, were primary factors in the 1974 offering producing a selling price of $11.62 per share."

The Company points out that the market-to-book ratio of its stock did not exceed 78% during a recent twelve-month period. We have stated that in some circumstances "forced dilution is confiscation." *New England Tel. & Tel. Co.* v. *Department of Pub. Utils.*, 371 Mass. 67, 76 (1976). But this of course does not mean that the mere showing that the market-to-book ratio is below one to one, without a showing that this results from unjustified State action, makes out a case of confiscation. See *Boston Edison, supra* at 16.

Finally, the Company points to its need for new capital. It claims that it faces a major construction program which will double its present capitalization. We do not reach the question whether that claim is accurate. As the Department found, while the capital budget for the eight years 1977 through 1984, is shown by the Company as $53,658,000, only $8,095,000 comes in the two years 1977-1978. About one-half of the needed funds can be generated internally, and the other half from short-term debt. "Therefore," according to the Department, "the Company will be under no urgent necessity to float new capital during that period, and the record shows that it has no plans to do so. The question

of driving the Company into the capital market at the period of a major dilution of the common equity does not arise at this time."

3. *Exclusion of Unit 6 from rate base.* The Department concluded that Unit 6 "is not now nor will in the future be used and useful in the service of ratepayers." The Department therefore ruled that Unit 6 should be excluded from the rate base, although it allowed the Company to recoup its investment in Unit 6 by amortizing the undepreciated balance of the unit over a five-year period. The Company argues that the decision of the Department to exclude Unit 6 from the rate base was taken without fair notice to the Company and is not supported by substantial evidence. See G. L. c. 30A, §§ 11 (1), 14 (7) (*e*).

The Company's argument as to fair notice is without merit. As noted above, the Department, in D.P.U. 18296 and 18297, had warned the Company to be prepared in its next rate case to justify the inclusion of Unit 6 in the rate base. The Department had also indicated that the New England Power Pool (NEPOOL) agreement "would impose no penalty where the Company is unable to meet its assigned reserve requirements because of an order by a public authority." In the face of these warnings, the Company introduced no evidence concerning NEPOOL deficiency charges that might result from the retirement of Unit 6. Months after the hearings were closed, it attempted to show that there would be such charges. The Department rejected the attempt as too late, and the Company claims surprise. There was no error. Cf. *Boston Edison, supra* at 7, 29-30.

As to substantial evidence, a preliminary note is in order. Within a substantial range, business decisions are matters for the Company's determination. See *New England Tel. & Tel. Co.* v. *Department of Pub. Utils.*, 371 Mass. 67, 84 (1976), and cases cited; *Weld* v. *Gas & Elec. Light Comm'rs*, 197 Mass. 556, 560 (1908). Even in such matters, however, the Company when challenged must come forward with evidence to explain its decisions and show that

they are not inconsistent with valid policies enforced by the Department. *New England Tel. & Tel. Co.* v. *Department of Pub. Utils.*, 360 Mass. 443, 493 (1971). The policy against allowing a return on unused property is such a policy. "The standby quality of venerable equipment must be proved." 1 A.J.G. Priest, Principles of Public Utility Regulation 176 (1969). Compare *State ex rel. Winlock Water Co.* v. *Department of Pub. Works*, 180 Wash. 278, 280-281 (1934), with *Pennsylvania Power & Light Co.* v. *Public Serv. Comm'n*, 128 Pa. Super. 195, 216-217 (1937). The Company has not sustained this burden here.

*a. Use of Unit 6.* The Department found that Unit 6 was actually operated, during the test year, to produce power amounting to only 6% of its capacity. The Company does not argue that 6% usage is sufficient to justify the inclusion of the unit in rate base. The Company argues, however, that Unit 6 is needed as standby, to meet emergencies. But the Department found that another electric generating unit owned by the Company, known as Unit 7, is available to respond to emergency situations. This finding is supported by the testimony of a company witness that Unit 7 was used during a recent emergency. The Company's assertion that Unit 6 was "instrumental in maintaining service" during that emergency is not fully supported by the evidence cited, which is a witness's bald assertion that there was "an orderly cold startup" of Unit 6 during the emergency.

As the Department noted, Unit 6 is kept on cold standby a large part of the time, "which means it is shut down and unmanned. Before NEPOOL becomes entitled to draw on it, 24-26 hours' notice is necessary." Because of this long startup time, a finding that Unit 6 is not useful in providing emergency service is reasonable. See *State ex rel. Winlock Water Co.* v. *Department of Pub. Works.*, 180 Wash. 278, 281 (1934) (plant not properly called standby when reconnection takes eighteen to twenty-four hours). "We reject any thought that a utility company can compel the Department to allow it to earn on obsolete plant by merely engaging in the fiction of labeling it as standby plant." *Boston Gas*

*Co.* v. *Department of Pub. Utils.*, 367 Mass. 92, 99 (1975).

*b. Future deficiencies.* It appears that NEPOOL expects its members, including the Company, to maintain a total capacity of 122% of their predicted peak uses of power. If Unit 6 is retired, the Company claims that it will have a deficit of 1.47 megawatts (mw) in 1977-1978, below this NEPOOL requirement. But the Department found that such a deficit, if it were in fact incurred, would be "negligible." The Department also found that the deficit would result partly from the Company's recent acquisition of a new customer group and would therefore be "partly self-inflicted."

Since the Department approved the Company's recent acquisition of the new customer group, it cannot now punish the Company for that acquisition. But the Company has not shown that the "negligible" finding is unreasonable. As we noted above, the Company has not proved that Unit 6 is needed as a source of emergency power. Nor has the Company shown that it is likely to face severe consequences from NEPOOL, should it have a deficiency in reserve capacity.

We note also that the Company has sold power to other companies, thus reducing its available capacity. The Company agreed to sell 15 mw a year for two years, just before the close of the Department's hearing. But for that sale, the Company would not be facing a deficit in 1977-1978. The Department noted that "the Company cannot, on the one hand, sell the lower-cost capacity of Unit No. 7 and, on the other hand, require ratepayers to support the higher-cost Unit No. 6 on the ground that if they do not, there will be insufficient capacity."

The Company argues that it will face deficits far greater than the 1977-1978 deficit in later years, if Unit 6 is retired. The Company's analysis projects a deficit of 11.90 mw in 1978-1979. Were it not for the sale the Company made just prior to the close of the Department's hearing, it would not be facing that deficit. The Company has not shown that it will be unable to eliminate the deficit by purchasing power from others. The Company's analysis projects large deficits

beginning in 1981-1982. But the Company's analysis is based on the unreasonable assumption that it will not purchase power at a level similar to its levels of purchases in the past. The Company has therefore not shown that Unit 6 will ever be needed to avoid a nonnegligible deficit. Contrary to the Company's assertion, the Department's decision shows that the Department did consider the Company's power needs for the years following 1977-1978.

One of the Commissioners, dissenting in part from the Department's decision in this case, thought that the retirement of Unit 6 was "imprudent." He stated that, in deciding that Unit 6 will not be needed, the Department had taken the optimistic view that several nuclear power plants, in which the Company has acquired shares, will be completed as scheduled. But the Department acts by majority vote of the commissioners. G. L. c. 25, § 4. If its decision is supported by substantial evidence, the decision must be sustained. The balance between maintaining costly and unneeded capacity on the one hand, and taking too great a risk on the other, is entrusted to the Department rather than to this court.

*c. Costs.* The Company argues that, if Unit 6 is retired, the Company may be unable to meet its NEPOOL capacity requirements and will then face NEPOOL deficiency charges. The Department found that the Company will not face NEPOOL deficiency charges for two reasons. First, despite the Company's claim, there was "little probability" that the Company deficit will exceed the 1% figure which triggers imposition of NEPOOL deficiency charges. Second, any deficit the Company may have will result from action by the Department, and NEPOOL does not impose charges when a deficiency results from an order by a public authority. There is substantial evidence to support the Department's finding. Moreover, the Company's analysis does not show whether the deficiency charges could be avoided by purchases from other companies.

The Company argues that, if Unit 6 is retired, "power purchased from NEPOOL would cost more because it

would be purchased against Unit 7, which has energy costs 53% greater than Unit 6." The Company has not fully explained what it means by purchases against a unit, nor has it pointed us to NEPOOL regulations governing the cost of purchased power. The Company's analysis assumes that the cost of power it purchases from NEPOOL will go up if the cost of power it would have produced but for the purchases goes up. On that assumption, the Department did not have to accept the Company's contention that its cost of producing power in Unit 6 is less than its cost of producing power in Unit 7. Contrary to the Company's claim, the Department's decision shows that the Department did consider the Company's claim that it was purchasing power "against" Unit 6. But the Department correctly found that this factor was relevant only to the issue of costs, and correctly found that the Company had not made out a case on the issue of costs.

The Company adds an argument that if Unit 6 is retired, the Company will immediately have to commit itself to new construction to replace Unit 6 and that such new construction would be vastly more expensive than Unit 6. Even if the Company will need new capacity to replace a unit which it has almost never used in recent years, the Company has not proved that it will have to construct new plant to provide this new capacity rather than purchasing power elsewhere. We think that the Department could reasonably assume that the Company will be able to purchase power, to meet its needs, at costs lower than those of either Unit 6 or any new plant which might be built to replace Unit 6.

The Company complains that the Department's decision deals with its arguments about costs rather summarily. Some of the Department's findings could have been more thorough. But the Company was required to prove its case before the Department by presenting a clear and reasonable analysis. See *New England Tel. & Tel. Co.* v. *Department of Pub. Utils.*, 371 Mass. 67, 79 (1976); *New England Tel. & Tel. Co.* v. *Department of Pub. Utils.*, 360 Mass. 443, 493 (1971). The Department found that the Company's cost

375 Mass. 571 583

Fitchburg Gas & Electric Light Co. v. Department of Public Utilities.

analysis was "misleading" and "widely erroneous" and that the Company had not made a case justifying retention of Unit 6. These findings are supported by substantial evidence. In the absence of a more helpful analysis by the Company, the Department's findings were sufficient.

We conclude that the decision of the Department excluding Unit 6 from the rate base is reasonable and supported by substantial evidence.

4. *Adjustments resulting from the retirement of Unit 6.* In the course of excluding Unit 6, the Department made adjustments to the test year results. The Department may make such adjustments if reasonable. See *Boston Gas Co.* v. *Department of Pub. Utils.*, 359 Mass. 292, 317 (1971). But two of the adjustments made are not supported by substantial evidence, and a third should be reconsidered.

*a. Tax savings due to amortization.* The Department treated the amortization it was allowing the Company for Unit 6 as a Federal tax deduction. Thus the Department allowed the Company to generate revenues of $447,432 a year to cover an allowed amortization expense on Unit 6 of $447,432 a year. Since amortization is not a Federal tax deduction, this understated by $472,831 the revenue required to provide the Company with a net amount sufficient to cover the amortization. Amortization of other retired property was not treated as a tax deduction.

The Company made a motion for correction of calculating errors, and the Department issued a supplemental order explaining its treatment of the amortization. The Department conceded that amortization is not deductible. But it stated, "The issue presented is not the simplistic point the Company makes . . . . There clearly are tax benefits associated with this investment through the vehicle of either accelerated depreciation or loss write-off. Consistent with the principle of matching tax benefit with rate burden, some recognition of the associated tax benefits must be given to current ratepayers."

In some circumstances it is proper for the Department to "normalize," by matching known tax benefits with the

known expenses with which they are associated. See *Boston Edison, supra* at 32-38. But "normalization" was used improperly here. We are not cited to any evidence to support a finding that the Company will have tax savings equal to what it would save if amortization were deductible. We assume, without deciding, that it would be permissible for the Department to match a known future year tax benefit against a current expense associated with the tax benefit. But the Department may not normalize by making an estimate unsupported by evidence. Cf. *Boston Edison, supra* at 30-31.

The Department concedes in its brief that the "application of the normalization concept in this case is, of necessity, an approximation because, until Unit 6 is actually retired, neither the Company nor the Department can be certain of the exact tax benefits which the retirement will produce." Therefore, the Department must wait until tax benefits are subject to reasonable estimation before it may take account of them in setting the Company's rates. The Department must modify its order to provide the Company with sufficient revenues to yield the amortization expense on Unit 6 of $447,432, after taxes.

*b. Local property taxes.* The Department determined that $186,700 in local property taxes would be saved by the retirement of Unit 6. The determination was based on a Company exhibit allocating $186,700 in local property taxes to Unit 6. But there was undisputed testimony that, pursuant to a tax case settlement, the Company pays its property tax on a fixed base of $17 million, and that the tax would not be reduced by the retirement of Unit 6. It was erroneous for the Department to assume that any part of the $186,700 could be saved.

The Department argues in its brief, however, "the Company's agreement with the City of Fitchburg in no way binds the Department . . . . The burden is on the Company to seek to modify its agreement with the City in light of the diminished value of its retired property." But we think that the tax case settlement was a matter within the sphere of the Company's business judgment. See *New England Tel. & Tel.*

Co. v. *Department of Pub. Utils.*, 371 Mass. 67, 84 (1976), and cases cited; *Weld* v. *Gas & Elec. Light Comm'rs*, 197 Mass. 556, 560 (1908). In the absence of a finding that the Company acted in bad faith or unreasonably in agreeing to the settlement, or has acted in bad faith or unreasonably in failing to seek to modify it, the Company is entitled to revenues to cover its entire property tax expense.

*c. Operation and maintenance expense.* The Company submitted an exhibit showing operation and maintenance expense of $135,000 during 1976 associated with Unit 6, and the Department determined that this sum would be saved by the retirement of Unit 6. The Company now asserts that some part of the $135,000 consisted of general overhead costs which would have been incurred whether or not Unit 6 was in operation. Of course an adjustment to test year data for projected savings in expense should be based on a reasonable estimate. Cf. *Boston Edison, supra* at 30-31 (adjustment for estimated tax increases). General overhead costs, even though allocated to Unit 6, provide no basis for such an estimate.

We have held that the Company had reasonable notice that inclusion of Unit 6 in the rate base was in question, and we think the Company should have been prepared to deal with related adjustments. The Department could properly rely on the $135,000 figure supplied by the Company. Nevertheless, the case is to be remanded to the Department for other reasons. We think it appropriate to afford the Company an opportunity to supply a reasonable estimate of the part of the $135,000 that will not in fact be saved if Unit 6 is retired. See *New England Tel. & Tel. Co.* v. *Department of Pub. Utils.*, 360 Mass. 443, 494 (1971).

5. *Projected debt.* On a recommendation by the Attorney General, the Department made an adjustment to the test year results in determining the size of the Company's debt. The Department projected that the Company's long-term debt would be at the same level as at the end of the test year, excluding two maturing issues. The Department projected that the Company's short-term debt would be at the level of

an average of short-term debt during the test year. The Company argued for an alternative adjustment, which calculated debt at a level below the Department's projection. If the Company's projection were adopted, it would be entitled to generate additional revenues, since its interest payments would be projected as less, and its resulting savings from income tax interest deductions would be projected as less, than under the projection adopted by the Department.

Projecting short-term debt at a level equal to an average of short-term debt during the test year "was an appropriate way to reflect the Company's usual short-term borrowing experience." *Boston Edison, supra* at 39. Taking full account of long-term debt, incurred toward the end of the test year but continuing during the future period for which rates were being set, was also reasonable.

Since the adjustment adopted by the Department was reasonable and supported by substantial evidence, the Department was not required to adopt the Company's proposed adjustment, even if it was also reasonable. In any event, the Company's proposed adjustment was not reasonable. The Company sought, on the one hand, to make an adjustment from the actual test year results but sought, on the other hand, to project long-term debt at a level below what it would be in the future. Thus, contrary to the Company's assertion, there was no error in the Department's view that the Company's proposed adjustment did not properly take account of all existing long-term debt. There was also no error in the Department's upward adjustment of the Company's debt without an offsetting correction to the rate base. There is no indication that the used and useful rate base will be immediately expanded as a result of the increased debt which the Department projected.

6. *Abnormal abandoned property treatment.* The Department has ordered that certain property retired by the Company be given "abnormal" abandoned property treatment, charging the undepreciated balance of original cost as amortization expense. The Company had argued that the

property should be given "normal" retired property treatment, reducing the depreciation reserve by the entire amount of original cost. The Department in its brief asserts that "normal" retirement would result in overstating the rate base of the Company.

The Company does not now argue that it was error for the Department to require the use of the "abnormal" treatment. It asserts, however, that the Department may not order it to adopt this treatment retroactively. The Department's decision in the present case ordered the Company "to bring its books into conformity with this decision . . . beginning with the year 1976."

We read the Department's decision in D.P.U. 18296 and 18297 (December 31, 1975), as requiring "abnormal" abandoned property treatment of the property in question. That the Company was then asked to "provide more detailed information" in its next rate case does not mean that the decision had not been made. All this was explained to the Company in the Department's supplemental order, to D.P.U. 18296 and 18297, of July 7, 1976. The Department there stated that it had concluded "that the abnormal treatment is the more appropriate means of handling the premature retirement . . . . Rate base and cost of service are adjusted accordingly." Yet the Company now seeks a rate base, for the 1976 test year, as if there had been a "normal" retirement. The Department's decision in the present case merely implemented its earlier decision and was not retroactive. There was no error.

7. *Conclusion.* As a result of our decision, it appears that the Company will be entitled to earn the following additional revenues:

(a) to cover the tax on funds received for the amortization of Unit 6: $472,831.

(b) to cover local property tax expense: $186,700.

(c) to cover operation and maintenance expense: some part of $135,000.

The Company is being permitted to amortize Unit 6, and the immediate savings from the unit's retirement may be

negligible. We recognize that the Department's decision, as modified pursuant to our decision, may lead to the peculiar result of allowing the Company more revenues than it would have been allowed had it prevailed in its argument against excluding Unit 6 from the rate base. The Department's decision excluding Unit 6 from the rate base remains defensible, however, since savings to ratepayers should result in the long run. But the Department may not add to these savings by assuming tax treatment or reductions in expenses which do not exist. We add that, in these circumstances, to say that the Company is not facing imminent confiscation seems to us like an understatement.

The case is remanded to the county court. There an order is to be entered directing further consideration and decision by the Department consistent with this opinion and further report of its action therein by the Department to the county court. The stay heretofore granted is to remain in effect until further order of the county court, which need not await the Department's report.

*So ordered.*