GREENLEAF FINANCE COMPANY & others[1] vs. SMALL
LOANS REGULATORY BOARD; DORCHESTER COMMUNITY
ACTION COUNCIL & another, interveners.

Suffolk. November 8, 1978. — February 12, 1979.

Present: HENNESSEY, C.J., KAPLAN, WILKINS, LIACOS, & ABRAMS, JJ.

*Administrative Law*, Judicial review, Rate setting. *Regulation. Small
Loans Regulatory Board. Small Loans.*

The Small Loans Regulatory Board was justified in concluding that its
new rate order would generate $36,852,600, the amount necessary
to provide a fair and reasonable return to efficient companies in
revenue from interests, delinquency charges, and collections on
previously charged-off loans. [292-296]
The Small Loans Regulatory Board did not abuse its discretion in
using 1975 figures for certain items of expense and revenue to
calculate the rate of return to efficient companies rather than five-
year averages as provided by a stipulation before the Board. [293-
[296-298]
The Small Loans Regulatory Board was not required to promulgate a
rate order which would ensure a 10% rate of return to the industry
taken as a whole but was justified in securing only efficient compa-
nies the target return and employed proper standards to determine
efficiency. [298-300]
Upon review of a rule-making proceeding before the Small Loans
Regulatory Board, claims of the plaintiffs, twenty-two small loan
companies, alleging confiscation in that the allowed rate of return
would not be achieved, that, even if achieved, it would not be suffi-
cient to attract additional capital, and that aggregate industry
losses might be repeated under the new rate order were without
merit. [300-302]

CIVIL ACTION commenced in the Superior Court on
November 18, 1976.

The case was heard by *Garrity*, J.

---

[1] Twenty-one small loan companies, licensed, like the named plain-
tiff, under G. L. c. 140, § 96.

The Supreme Judicial Court granted a request for direct appellate review.

*Harold Hestnes* for the plaintiffs.

*Leo S. McNamara*, Assistant Attorney General, for the Small Loans Regulatory Board.

*Robert Sable* (*Harry Pierce* with him) for the Dorchester Community Action Council & another, interveners.

KAPLAN, J. The Small Loans Regulatory Board (Board), consisting of the Board of Bank Incorporation (the Commissioner of Banks, the Commissioner of Revenue, and the State Treasurer[2]) and two persons appointed by the Governor (see G. L. c. 26, § 5A), is charged by G. L. c. 140, § 100, with establishing a "maximum rate of charge" for small loans, i.e., loans of $3,000 or less. Such a rate of charge—actually, as permitted by the statute, graduated charges—was set in 1960 by a predecessor Board and, with a change introduced by St. 1962, c. 795, § 1, remained in force for more than a decade. The unusual, poor years 1974 and 1975 were the first in which the industry suffered aggregate losses; even so, in 1975, the worse of the two years, fourteen of the fifty-five companies, making over 65% of the loans, showed profits.[3] On December 27, 1974, Massachusetts Consumer Finance Association, representing about half the small loan companies licensed under c. 140, § 96, joined by Greenleaf Finance Company, one of those companies, petitioned the Board to grant rate increases. The Board held hearings on nineteen days between September 22, 1975, and July 16, 1976. Intervening to oppose the suggested increases were the Attorney General, Massachusetts Consumers'

---

[2] The latter two officials were represented by their deputies in the instant proceedings.

[3] In the fifteen years under the 1960 order, the industry averaged over $4,000,000 in profits. But in contrast with earnings of $3,152,408 in 1973, the industry suffered an aggregate loss of $191,703 in 1974, and $487,244 in 1975. For 1975, company profits ranged from $1,042 to $785,997; losses for all but four companies were $100,000 or less, with one company experiencing a loss of more than $600,000.

Council, Massachusetts Fair Share, Dorchester Community Action Council, and East Boston People's Rights Group. The petitioners presented eight witnesses, including an economist, an accountant, an investment banker, and various representatives of the small loan industry; both witnesses on the part of the interveners were economists. The transcript ran to more than 2,000 pages, with seventy-nine exhibits. Certain stipulations between petitioners and interveners were offered to the Board for its possible use. In very brief summary, the petitioners contended that increased costs justified larger revenues for the industry, and thus higher rates of charge; on the other side, there was argument that much of the industry was inefficient and that, because of intense competition from other lenders, higher charges were not necessary to provide adequate credit facilities for borrowers, nor would they be to the true advantage of the industry.

On November 1, 1976, the Board issued its report and a rate order to become effective on January 2, 1977. The order created a new rate structure believed to be in line with the more modern consumer finance practices. It increased the charges for some loans and decreased them for others. The new charges were not calculated to generate substantially more revenues than the old. Projected, they were expected to yield a return of 10% on equity assets to companies of acceptable efficiency.

Twenty-two of the fifty-five small loan companies, as plaintiffs, commenced the present action in the Superior Court on November 18, 1976, seeking to annul the order with a remand to the Board for further proceedings. The Attorney General represented the Board (see G. L. c. 12, § 3); the Dorchester Community Action Council and the East Boston People's Rights Group intervened on the side of the Board. The plaintiffs and interveners stipulated that the action should be regarded as one for a declaratory judgment; that the record should be limited to that made before the Board; and that "[f]or the purpose of this case, and for that purpose only, the proceeding before the

Board will be treated by the parties as rulemaking, rather than adjudicatory in nature." In effect the plaintiffs claimed that the order violated the regulatory statute in that it did not properly find or assess the factors that should enter into the rate of charge. They also contended that it would result in confiscation. A judge of the Superior Court, with opinion, held for the Board. The case is before us on the plaintiffs' application for direct appellate review. We agree with the judge's decision.[4]

We shall describe the rate order and the general findings on which it is based and then deal with the plaintiffs' particular contentions, indicating along the way the nature of the burdens cast on the plaintiffs in challenging such an order.

1. *The Rate Order and Its General Basis.* General Laws c. 140, § 100, as appearing in St. 1956, c. 689, § 4, directs the Board to "investigate from time to time the economic conditions and other factors relating to and affecting the business of making [small] loans," and to "ascertain all pertinent facts necessary to determine what maximum rate of charge should be permitted." That rate is to "induce efficiently managed commercial capital to be invested ... in sufficient amounts to make available adequate credit facilities to individuals seeking such loans at reasonable rates," and also to "afford those engaged in such business a fair and reasonable return upon the assets."[5]

---

[4] On this appeal we are mindful that "[e]ach court is conducting an analysis of the same agency record, and there is no reason why the first court's view should be given any special weight." *Zussman* v. *Rent Control Bd. of Brookline*, 371 Mass. 632, 642 (1976) (Wilkins, J., concurring). The views of the judge of the Superior Court, however, are consistent with our own.

[5] We have said that the small loan law, enacted originally in 1898, "was passed as a protection to the borrower," and "to prohibit the unlicensed business of making small loans and to prevent an excessive rate of interest on such loans." *Cuneo* v. *Bornstein*, 269 Mass. 232, 236 (1929).

For background on regulation of small loans, see Hubachek, The

*a.* In its findings on the experience of the companies under the existing rate order,[6] the Board noted that, despite substantial aggregate profits in the years through 1973, the industry since 1970 had been suffering a decline in business, which contrasted with a dramatic increase enjoyed by other lending institutions in the Commonwealth in the same period. (In making small loans, trust companies, savings banks, cooperative banks, savings and loan associations, credit unions, national banking associations, and Federal savings and loan associations also are limited to the maximum rate of charge established under § 100. See § 114A.) Thus personal loans outstanding at year-end 1975 made by other lenders in Massachusetts were $714,000,000 more than for 1970, yet the outstandings of small loan companies for 1975 were $9,-000,000 less than those for 1970. The Board ascribed the divergence to aggressive (and comparatively recent[7])

Development of Regulatory Small Loan Laws, 8 Law & Contemp. Prob. 108 (1941); Note, The Uniform Small Loan Law, 42 Harv. L. Rev. 689 (1929). A variety of materials concerning experience under contemporary regulatory schemes was submitted to the Board. See, e.g., National Consumer Finance Association, Research Report on Finance Companies in 1974 (1975); Eisenbeis & Murphy, Interest Rate Ceilings and Consumer Credit Rationing: A Multivariate Analysis of a Survey of Borrowers, 41 S. Econ. J. 115 (1974); Kawaja, The Regulation of the Consumer Finance Industry: A Case Study of Rate Ceilings and Loan Limits in New York State (1971).

[6] Among the data relied on was Public Document 95 (Exhibit 79) containing detailed financial statements for the year 1975 submitted by the licensed small loan companies respectively to the Division of Banks and Loan Agencies (see G. L. c. 140, § 98). Composite figures were assembled by the Division and made part of the exhibit.

[7] When the 1960 rate order was promulgated there were severe limits on the size of personal loans that could be made by banks and credit unions. Since 1960 legislation has been passed progressively removing those limits and thus permitting banks and credit unions to enter more fully into competition with small loan companies. For present provisions, see, e.g., G. L. c. 168, § 37 ($6,000 ceiling on personal loans by savings banks); G. L. c. 170, § 26(8) ($9,000 ceiling on personal loans by certain cooperative banks); G. L. c. 171, § 24(A) (separate ceilings for credit unions with varying amounts of total assets and insurance coverage).

competition from credit unions and banks which, as the Board said, were exploiting powerful advantages. Credit unions had access to volunteer labor, were frequently subsidized by their parent organizations, and, most important, lent to their own members, thereby reducing costs of obtaining credit information and making collections. The strategic position of banks was exemplified by the fact that small loan companies were often borrowing from the very banks with which they competed for small loan business. Banks were also able to benefit from cost saving aids such as computerized lending processes. In the result, credit unions and banks were simply able to charge less for small loans.[8] The competition was direct as there was testimony that these lenders were serving the same general group of borrowers as the small loan companies.[9]

*b.* There was wide disparity in the "efficiency" of small loan companies as reflected in the three principal expense items. As to overhead expense (taken to include State taxes), the median cost per account was about $79 in 1975, but some companies incurred costs of nearly twice that amount. Some companies in the same year had been able to borrow money at considerably lower interest charges than others.[10] So also there was large variation of

---

[8] The plaintiffs appear to suggest at some points that the Board erred in considering the situation of banks and credit unions in fixing the maximum rate of charge, but the Board's mandate was to examine all pertinent facts. Indeed, as indicated in our text, by G. L. c. 140, § 114A, banks and credit unions are expressly made subject to the board's rate order.

[9] See Eisenbeis & Murphy, Interest Rate Ceilings & Consumer Credit Rationing: A Multivariate Analysis of a Survey of Borrowers, *supra* note 5. It follows that there could be no serious challenge to the Board's finding that under its rate order adequate credit facilities will be available for borrowers.

[10] The differences were attributed mainly to the ability of larger companies to obtain long-term loans at relatively low interest rates. But there were variations with respect to smaller companies as well. Thus some of the "independents" paid 10% or more and others as little as 6.2%.

experience with bad debts (defaulted loans).[11] The latter two elements had been worsened by the unusual conditions facing the industry in 1975, a year in which unprecedented high interest rates were combined with a recession. Yet the Board found that in 1975 efficient companies—those controlling their costs—were able to earn profits under the existing order.[12]

c. Before the Board the companies had proposed a target rate of return to the companies of 13% on equity capital. The Board, as already noted, allowed 10%. (The 1960 order had provided a 7.4% return.) In argument before us, the plaintiffs indicated that 10% was not unreasonable—leaving open the question where the line was to be drawn of efficient companies entitled to such a return. The Board could consider that the small loan business carries relatively little risk, for only small fixed capital is required and borrowed funds account for about 80% of total assets. The 10% figure was taken to reflect approximately this risk, and thus the industry's attractiveness to putative investors, but the situation did not suggest that there would be much if any need or desire to attempt to attract additional capital in the near future.

d. The foregoing considerations led the Board to decide that the industry did not require total revenues measurably in excess of those generated by the existing rate order. As seen at the time, the statutory aims—adequate credit facilities, reasonable charges to borrowers, and fair returns to efficient companies—could be, and therefore should be, attained without such an increase.

---

[11] In 1975 the industry average for bad debts was 4% of the total dollar amount of loans outstanding, but some companies were able to keep the figure around 1.55%. An economist testified that "if we look at the companies that made profits, they're the ones who have been able to keep bad debts expense by and large below the industry average."

[12] The Board found that efficient companies were earning a sufficient return on equity assets in 1975. A number of the profitable companies, however, in fact earned less than a 10% return.

*e.* Although no material increase in revenues was necessary, changes were called for in the scaling and character of the rates of charge for small loans. These changes would bring the existing rate order into conformity with modern practice and at the same time permit rate increases on loans shown to be least profitable.

Under the existing order maximum charges to borrowers were composed of interest and certain additional charges for late payments. The interest was 30% per year on unpaid principal balance up to $200; 24% on so much as was between $200 and $600; 21% on so much as was between $600 and $1,000; and 9% on any remainder exceeding $1,000. The companies were also allowed to make extension, default, and deferment charges as described in the margin.[13] The plaintiffs' submission to the Board did not specifically request revision of the late payment charges, but, as to interest, they proposed an add-on structure[14] of $17 per $100 per annum on so much of the loan as was below $500, $15 per $100 on so much of the loan as was between $500 and $1,500, and $14 per $100 on the remainder exceeding $1,500. The interest rates authorized by the new order consisted of an add-on charge of $10 per $100 per annum or (alternatively) 18% per annum on unpaid principal balances of the loan. Con-

---

[13] The "extension" charge could be collected if the first installment was scheduled to be paid more than one month after the date of the loan. For each such day beyond the month, the loan company could collect an amount equal to one-thirtieth of the interest charge for the first month. The "default" charge could be collected if a borrower failed to pay any scheduled installment for more than ten days after the original installment date; it could not exceed the interest charge for the last originally scheduled installment period of the loan contract. The "deferment" charge was collectible if the borrower and the lender agreed to defer the payment of any scheduled installment one month or more; it could not exceed the interest charge for the first month of the deferment period multiplied by the number of months in that period.

[14] An add-on structure is one in which the interest charge is computed as a percentage of the original loan, rather than of unpaid principal balances.

forming with the practice in at least two other States, the Board also permitted an initial administrative fee of $15 on the loan (this fee could not be assessed to a borrower more than once during any twelve-month period). The companies could collect a new default charge equal to the lesser of $5 or 5% of the installment defaulted. The Board did not alter the method of calculating extension and deferment charges, but these charges would be changed in amounts because of their relation to the interest rates that were being freshly promulgated.

By the new order, total interest charges were increased on some loans and decreased on others: there was a reduction as to loans between $225 and $2,250, and an increase on loans below $200 and above $2,500. This followed evidence as to the behavior of both categories under the previous rate order. Loans below $200 had tended toward the unprofitable line because of fixed costs incurred for loans regardless of amount; the uniform administrative fee responded to that problem. And the new rate order reacted to the fact that some companies had been reluctant to make loans in the higher ranges.[15]

*f.* To compute the probable future return to companies, the Board calculated the revenue which would be generated by applying the new rates to the loans outstanding

[15] Before the Board, the companies suggested that "annual percentage rates" (APR) would provide a basis for comparison of the previous and proposed orders. To this end the companies computed APR under those orders for a variety of one-year loans repaid in monthly installments. APR represents the yearly interest rate on unpaid principal balances; it is calculated as the total annual interest charge divided by the average amount of the unpaid principal balance of the loan. Under the 1960 order, APR was between 30% and 28% on loans up to $500; between 28% and 23% on loans from $500 to $1,500; and between 23% and 17% on loans from $1,500 to $3,000. Under the order proposed by the companies, APR would have been about 30% on loans up to $500, 30% to 28% on loans from $500 to $1,500, and 28% to 26% on loans from $1,500 to $3,000. By the order actually adopted by the Board, APR (taking account of the administrative fee) is about 43% to 23% on loans from $100 to $500, 23% to 20% on loans from $500 to $1,500, and 20% to 19% on loans from $1,500 to $3,000.

in 1975; subtracted the "normal" or adjusted expenses of business in 1975; and divided the remainder by the sum of equity assets.[16] Expenses were adjusted as follows: instead of the actual rate of interest on borrowed funds and the actual percentage of bad debts, the Board used historical averages for the past five years; instead of the actual figure for overhead cost, the Board adopted a figure equal to the number of accounts outstanding in 1975 multiplied by the overhead cost per account of an efficient company;[17] and instead of the actual figure for Fed-

[16] The Board stated in its report: "[W]e have taken the gross income which would have been received in 1975 by the licensed lenders under the maximum rate of charge established hereinafter by the Rate Order, deducted therefrom the actual and normal expenses of the business for the same period (cost of debt, overhead, federal income taxes and bad debts)[,] divided the remainder by the sum of the equity assets used and expressed the result in a percentage. We have considered as gross income the total of allowable charges collected from borrowers on loans. We have used as a fair and reasonable cost of borrowed funds the actual price for them over the past five years, 7.25 percent. We have used as a normal level of bad debts, 3 percent of outstandings. The expenses of the regulated business when expressed as average cost per open account has increased and we find that it is probable that some such increase will continue during the immediate future as will the average size of the loans made."

The plaintiffs question whether the Board made use of 1975 figures in computing expenses and revenues, but the Board said it calculated "the gross income which would have been received in 1975" and the adjusted expenses "for the same period."

[17] The Board did not state a precise figure for overhead expenses, but it did set forth its methods for determining revenue and rate of return and indicated all pertinent figures except Federal tax. It may be assumed that Federal tax was taken, according to the stipulation before the Board, as 40% of pre-tax income. To attain a 10% return, it follows that the Board used a figure of about $14,713,659 for overhead expenses. See note 28 *infra*. This equals the number of accounts outstanding in 1975 (177,273) multiplied by a cost per account of $83. Considerable evidence had been received on the cost per account of various companies, and overhead costs were plainly a measure of efficiency. The $83 is to be viewed as the Board's judgment about an efficient operation. We do not accept the plaintiffs' argument that the Board used the actual 1975 figure for overhead expenses; that would result in a return of about 8% and would be inconsistent with the Board's statement that its order was designed to, and would, provide a 10% return to efficient companies.

eral taxes paid, the Board used a stipulated percentage of net pre-tax income. By this route the projected revenue appeared substantially lower than that envisaged by the companies' proposed rate structure, but somewhat higher than that actually received in 1975.[18] Efficiently managed companies could expect a return of 10%. In the calculations outlined, the fact that 1975 was an unusually poor year favored the companies because the year's outstandings were depressed: if the Board had used a higher figure (such as a five-year average) for outstandings, a lower interest charge to customers would produce the needed revenue. The companies were disfavored by the use of five-year historical averages, rather than 1975 figures, for percentage of bad debts and rate of interest paid by companies for their borrowed funds, but the corresponding actual 1975 figures were extreme and would have distorted the projected return to companies.

*g.* We venture the final comment that the rate order was determined in part by a number of special considerations: aggressive competition from the outside; instability of some of the latest industry figures because of economic conditions that could be regarded as exceptional; evidence of inefficiency of many of the companies; and obsolescence of the design of some parts of the structure of the rates of charge.

2. *Statutory Claims.* Arguing that the rate order exceeded the Board's authority under G. L. c. 140, § 100, the plaintiffs say, first, the order would not provide the revenue that the Board found to be required to produce the 10% return; second, the fair and reasonable return must

[18] As indicated in the text below, the Board, applying the new order, projected revenue of $36,852,600 from interest, delinquency charges, and collections on previously charged-off loans. In 1975 the parallel categories had brought in $36,193,883.28 of revenue. We estimate that if the companies' proposed rate structure were applied to the 1975 loans, a revenue of over $46,000,000 would be projected from the interest charges alone.

extend to the industry as a whole, whereas the order would secure it at best for companies the Board would hold to be efficient. In the latter respect the plaintiffs maintain that even if the order would provide the target return for some industry members, it would not for the future reduce, and might indeed increase, the net aggregate loss incurred by the industry in 1975.

The plaintiffs must shoulder a formidable burden in attempting to overcome the Board's determinations on such matters. In pursuance of the stipulation made in the Superior Court, the rate order is to be treated as a "rule" —a species of "regulation," see G. L. c. 30A, § 1(5)—as distinguished from a decision in an adjudicatory proceeding.[19] Hence, strictly speaking, it would not be enough for the plaintiffs to show that the rate order was unsupported by substantial evidence (cf. c. 30A, § 14[7][e], applicable to adjudicatory decisions); rather they must establish that the rate order crossed "the line of arbitrariness" or was "capricious." *Cambridge Elec. Light Co.* v. *Department of Pub. Utils.*, 363 Mass. 474, 496, 498 (1973). For the approach of a court to an agency regulation is as deferential as that to a legislative enactment. See *Cambridge Elec. Light Co.*, *supra* at 490-491; *Palm Manor Nursing Home, Inc.* v. *Rate Setting Comm'n*, 359 Mass. 652, 655-656 (1971) (quoting from *Druzik* v. *Board of Health of Haverhill*, 324 Mass. 129, 138-139 [1949]: "The regulation stands on the same footing as would a statute .... All

---

[19] Consistently with their stipulation that the rate order was to be regarded as a regulation (we need express no opinion on this matter apart from the stipulation), the plaintiffs and interveners stipulated that the action was to be treated as one for a declaratory judgment. See G. L. c. 30A, § 7 (judicial review of regulations by means of declaratory action). The plaintiffs appear to argue that since the action was declaratory, they are entitled to "de novo" review of the Board's determinations, but that would be to confound altogether the distinction between regulations and adjudicatory decisions for purposes of judicial review. That an action is declaratory is not in itself decisive of burdens of proof or the like, any more than it decides whether a jury is demandable. See G. L. c. 231A, § 1.

rational presumptions are made in favor of the validity of every legislative enactment"). As will appear, the plaintiffs have been unable to carry the burden assumed or (in the view of the judge below, which we share[20]) even a lesser burden.

*a. Projected revenue.* In order to provide a fair and reasonable return to efficient companies, the rate order must—and would—generate $36,852,600 in revenue from interest, delinquency charges, and collections on previously charged-off loans: so the Board found. The plaintiffs do not contest the finding that, using the 1975 year-end figure of $178,364,324 in loans outstanding, the new 18% rate would produce revenue of $32,105,578.32.[21] Nor do they dispute that, in 1975, $379,111.45 was obtained from collections on previously charged-off loans: this amount could fairly be used as an estimate for a later year. But the plaintiffs suggest that the new administrative fees and increased default charges could not make up the needed balance of $4,367,910.23. We disagree. Although the Board did not set forth precise calculations, its conclusions were justified.[22]

(1) *Administrative fees.* Refinancings are subject to the $15 administrative fee only when made at least a year after the original loan. In 1975, 128,453 "new" loans were made but it appears from the record that about one-half were refinancings. The plaintiffs did not supply evidence as to the number of refinancings made after one year, and

---

[20] The judge below spoke of "reasonable support in the Record" (evidently meaning that the plaintiffs must show a lack of such support), and referred to a remark in *Massachusetts Bonding & Ins. Co. v. Commissioner of Ins.*, 329 Mass. 265, 273 (1952).

[21] None of the parties has offered any argument or estimate as to the revenue which would be derived if the alternative add-on rate were used. The question is not pursued in this opinion.

[22] By the computations set forth in the text below and in notes 25 and 28, *infra*, we do not mean to suggest that the figures are precisely those used by the Board. They are sufficient, however, to show that the Board's determinations, far from being arbitrary, are adequately supported.

the Board was entitled to estimate that not less than one-half would fall in that class. If the fee is applied to 75% of the "new" loans, revenue of $1,445,096 would be produced from the $15 charge. We need not go on to note that the companies have some capacity to defer refinancings in order to put themselves in a position to collect these fees.

(2) *Default charges.*[23] If a borrower fails to pay any installment for ten days beyond the scheduled payment date, loan companies may now collect a charge therefor of the lesser of 5% of the installment or $5. For most loans this represented a substantial increase over the old rate order, which permitted a charge not in excess of the interest charge for the final installment period of the contract. The amount of the increase varies with the term and amount of the loan: for a three-year loan of $3,000 repaid in equal monthly installments, the revenue provided by the new charge represents an increase of about 400% over the old; for a two-year loan of $2,000, the increase is about 340%; for a one-year loan of $1,000, the increase is about 250%. The plaintiffs have not introduced evidence as to the probable incidence of defaults on loans of given terms and amounts, factors needed to estimate the revenue to be derived from the new charge. In the absence of such evidence, the interveners and the Board suggest that the new charge would result in increasing the revenue from this category by 340%.[24] Such an estimate

[23] The Board stated that, in addition to interest charges (including administrative fees) and collections on previously charged-off loans, its revenue figure consisted of "delinquency fees," which in 1975 accounted for $852,430.54. In equating delinquency and default charges, we follow the parties, none of whom has distinguished between the two. The plaintiffs have not asserted that the revenue received from "delinquency fees" was composed in part of extension or deferment charges, nor have they developed what effect such a circumstance would have on the Board's projected revenue figure.

[24] The interveners also point out that a number of companies chose not to collect default charges in 1975; if those companies elected to make the new charges, a multiple of only 3.0 or 3.1 might provide sufficient revenue to meet the Board's projection.

seems quite acceptable. Since $852,430.54 was received in default charges in 1975, the Board could not be said to be arbitrary (or unreasonable) in concluding that the pertinent revenue would approximate $2,898,263.80.

These computations suggest that the Board could conclude that the revenue to be derived from interest, administrative fees, default charges, and collections on previously charged-off loans would be about $36,-852,600.[25] To this we add that in computing projected revenue the Board was entitled to give weight to the fact that 1975 outstandings were unusually low, as well as to its forecast that the amount of the average loan would increase. If either of these figures should rise, the Board's revenue requirement might be met with ease.

*b. Return to companies.* We noted earlier that the return of 10% to efficient companies was reached by taking the projected revenue of $36,852,600, subtracting adjusted expenses attributable to cost of borrowed funds, bad debts, and overhead, and reducing the resulting figure by a percentage representing Federal tax. For annual cost of borrowed funds, the Board multiplied the stipulated[26]

---

[25] *Revenue* would be made up thus:

| | |
|---|---|
| Interest<br>(18% on 1975 loans outstanding<br>$178,364,324) | $32,105,578.32 |
| Collections on previously charged-<br>off loans<br>(1975 figure) | 379,111.45 |
| Delinquency fees<br>(3.4 multiplied by 1975 figure) | 2,898,263.80 |
| Administrative fees<br>($15 multiplied by three-fourths<br>1975 figure for new loans) | 1,445,096.00 |
| Total | $36,828,049.57* |

(*The slight disparity between this figure and that in the text may result from the use of rounded estimates.)

[26] Before the Board the plaintiffs and interveners stipulated to the variables entering into a determination of revenue, and adopted fig-

five-year average of 7¼ % by $147,224,000 (the 1975 year-end figure for debt capital), giving a $10,673,740 total; bad debt expenses were obtained by multiplying the five-year average of 3% by $178,364,300 (the 1975 figure for loans outstanding), yielding $5,350,930. The Board found an overhead of about $14,713,659 by multiplying 177,273 (the number of accounts outstanding in 1975) by about $83, the figure evidently adopted as the average cost per account of an efficient company.[27] For Federal taxes the Board used the stipulated percentage of 40%. By this route, projected expenses amounted to about $30,738,329, for a pre-tax income of $6,114,271. With 40% subtracted, the net profit was $3,668,563, a return of about 10% on equity assets ($36,806,000 in 1975).

The plaintiffs appear to challenge the Board's use of 1975 figures rather than five-year averages as provided in the stipulation before the Board. On the revenue side, the amount of 1975 loans outstanding was applied in calculating receipts from the 18% rate; and the Board used 1975 figures from which to estimate collections on loans previously charged off, and sums to be derived from administrative fees and delinquency charges. Equity assets were taken as of 1975. As to expenses, the figure for 1975 loans outstanding was the base on which bad debt expenses were calculated; the 1975 figure for debt capital was used in calculating cost of borrowed funds; and the 1975 number of accounts outstanding was the base for determining overhead expenses.

The plaintiffs have not shown that, had the suggested five-year averages been used for all revenue and expense

---

ures for certain expense items. The Board accepted the variables as relevant, and also used the stipulated figures for interest on borrowed funds and percentage of bad debts. At the same time it preferred to use 1975 figures for other items of expense and revenue rather than stipulated five-year averages.

[27] See note 17, *supra.*

figures, the projected return would be less than 10% on assets, which would necessitate a higher rate of charge to bring the return up to that percentage. But that point aside, we note again that use of the 1975 outstandings in calculating revenue favored the plaintiffs; it also tended toward reliability because loans had declined in past years. The same could be said for the adoption of the most recent figures for computing other revenue and expense items. *New England Tel. & Tel. Co.* v. *Department of Pub. Utils.*, 371 Mass. 67, 71 (1976), and cases cited. As to the use of averages as multipliers to arrive at cost of borrowed money and bad debt expense, in these aspects, on the testimony adduced, the year 1975 could be regarded as aberrational and a conflation of years thought more accurate. There was surely no abuse of discretion. Cf. *Attorney Gen.* v. *Commissioner of Ins.*, 370 Mass. 791, 797-799 (1976).[28]

*c. As to general approach.* Next the plaintiffs criticize the Board's approach, which was directed to securing only efficient companies the target return. They say that it was unfair and illegal not to promulgate a rate order which would ensure a reasonable return to the industry taken as a whole. They point out that the Board projected no such industry-wide return: if the industry's actual overhead expenses were substituted for those expenses as adjusted by the Board, the return would be about 8% of

---

[28] The *Return* may be pictured thus:

| | | |
|---|---|---|
| Revenue | | $36,852,600 |
| — Cost of debt | | −10,673,740 |
| (7¼% × $147,224,000) | | |
| — Bad debt expenses | | −5,350,930 |
| ($178,364,300 × .03 | | |
| — Overhead | | −14,713,659 |
| pre-tax profit | = | 6,114,271 |
| — 40% taxes | | −2,445,708 |
| Net profit | = | 3,668,563 |

$$\frac{3,668,563}{36,806,000} = 10\% \text{ return}$$

equity assets; if all the actual 1975 expenses were used, the return would be less than 1%. And the plaintiffs refer to cases where we have said that "[r]ates are not adequate, fair and reasonable if a large aggregate loss for the preceding year and a probable greater loss for the year in issue are ignored and the preceding year's rates simply renewed." *Insurance Rating Bd.* v. *Commissioner of Ins.*, 359 Mass. 111, 115 (1971). See *Travelers Indem. Co.* v. *Commissioner of Ins.*, 358 Mass. 387, 389 (1970); *Aetna Cas. & Sur. Co.* v. *Commissioner of Ins.*, 358 Mass. 272, 278-281 (1970).

We note that there was no finding or necessary implication that the industry would incur an aggregate loss under the new rate order. On the contrary, the harsh and difficult conditions of 1974-1975 might not be repeated, and the changes of the rate structure could prove helpful. In any event the cases cited are not in point. In *Travelers* and *Aetna* the challenged rate order assured losses to virtually all companies involved; and in the *Insurance Rating Bd.* case we were simply remanding a rate order, insufficiently supported, with the notation that the industry's aggregate losses should not be ignored.

Here the Board found a segment of the industry to be inefficient. In such circumstances a 10% industry-wide return would be antagonistic to the statute, which speaks of "efficiently managed commercial capital" and "loans at reasonable rates": there was no legislative design to subsidize inefficient companies, or to provide excessive profits to efficient companies, or to oppress borrowers. We put to one side that it might be impossible to achieve any such return because of competition from other institutions offering loans at lower rates. The opportunity to achieve a fair return must be provided "only to those who conduct their operations in a reasonably efficient manner." *Zussman* v. *Rent Control Bd. of Brookline*, 371 Mass. 632, 639 (1976). See *Palm Manor Nursing Home, Inc.* v. *Rate Setting Comm'n*, 359 Mass. 652 (1971); *G & M Employment Serv., Inc.* v. *Commonwealth*, 358 Mass. 430,

438 (1970); *Aetna Cas. & Sur. Co.* v. *Commissioner of Ins.*, *supra* at 281.

It is argued that the Board employed improper standards in determining efficiency and that it erroneously equated efficiency with profitability. But there was testimony that profitability in the face of strong competition was an accurate indication of efficiency. Nor were the levels of the important expense items set in an arbitrary manner. With respect to overhead, the evidence showed that the median expense per account was slightly less than $79, and the average was $89.56; the average for profitable companies was $83.01. The expense figure evidently adopted—about $83—was significantly higher than that incurred by the majority of the industry in terms of volume of loans outstanding. We find no basis for faulting the Board's application of 1975 year-end figures to five-year average percentage rates in computing bad debt expenses and cost of borrowed funds. Contrary to the plaintiffs' contention, this was not a case of the Board's disregarding the companies showing losses in 1975. The new rate would allow those companies to obtain the 10% return if they proved capable of controlling costs, and the evidence indicated that such retrenchments were possible.[29]

3. *Claim of Confiscation.* The plaintiffs' claim under this head consisted essentially of asseverations on a constitutional basis of arguments already discussed, especially those grounded on the propositions that a 10% return on total equity assets would not be achieved; that, even if achieved, it would not be sufficient to attract addi-

---

[29] To the extent that control of certain costs could be traced to the benefits of large-scale operation, some of the smaller companies might be unable to reduce those costs below a certain level. But there was evidence that smaller companies were to a substantial degree able to control their costs. See note 10 *supra.* The Board could conclude that an inability to do more in that direction was itself a sign of inefficiency. Cf. *Palm Manor Nursing Home, Inc.* v. *Rate Setting Comm'n*, 359 Mass. 652, 656 (1971).

tional capital; and that aggregate industry losses might be repeated under the new rate order. The plaintiffs refer to a doctrine, traceable to *Ohio Valley Water Co.* v. *Ben Avon Borough*, 253 U.S. 287, 289 (1920), and maintained by us with the qualifications to be noted, that when a claim is made of unconstitutional confiscation of a party's property caused by agency action, the court is required to make "an independent determination of the facts." See *Warner Cable of Mass., Inc.* v. *Community Antenna Television Comm'n*, 372 Mass. 495, 501(1977), citing *Boston Gas Co.* v. *Department of Pub. Utils.*, 368 Mass. 51, 54 (1975).

Notwithstanding such a claim of confiscation, however, it is settled here, first, that independent review does not extend to subsidiary findings by the agency (see *Fitchburg Gas & Elec. Light Co.* v. *Department of Pub. Utils.*, 375 Mass. 571, 574-575 [1978]); and, second, that the agency action—in the present case a regulation—will be examined with the "presumptive validity" ordinarily attaching to it (*Zussman* v. *Rent Control Bd. of Brookline*, 371 Mass. 632, 642 [1976], Wilkins, J., concurring). On independent review, as thus delineated, we find no confiscation here and repeat, as we said in *Boston Edison Co.* v. *Department of Pub. Utils.*, 375 Mass. 1, 10 (1978), that "it is not enough . . . to allege confiscation in the hope that this court will disagree with the particulars of a complex decision and will supplant it with another more to the Company's liking."

In this view we need only mention specific constitutional authority—more drastic than the present case requires —which establishes that rates are not confiscatory "merely because the aggregate collections are not sufficient to yield a reasonable profit or just compensation to all companies that happen to be engaged in the affected business" when there is a failure to demonstrate that the business "is so well and economically organized and carried on that petitioners are entitled, as of right protected by the Constitution, to have premiums amounting in the

aggregate enough to yield a reasonable return or profit to all companies." *Aetna Ins. Co.* v. *Hyde*, 275 U.S. 440, 448 (1928). The *Aetna* principle has been applied in other attacks on industry-wide rates where revenue and expense figures varied among the individual companies. See *Jordan* v. *American Eagle Fire Ins. Co.*, 169 F.2d 281, 292-293 (D.C. Cir. 1948) (industry-wide rate order need not provide, for companies incurring unusually high expenses, the administratively determined reasonable return); *American Comm'n Co.* v. *United States*, 11 F. Supp. 965 (D. Colo. 1935). From another angle, noting that competition from other lenders was a principal reason for the industry's losses, we may refer to the proposition that the Constitution does not demand a rate increase when losses have resulted not from the current rate, but from economic competition. See *Market St. Ry.* v. *Railroad Comm'n of Cal.*, 324 U.S. 548 (1945); *D.C. Transit Sys., Inc.* v. *Washington Metropolitan Area Transit Comm'n*, 466 F.2d 394, 419-422 (D.C. Cir.), cert. denied, 409 U.S. 1086 (1972), and cases cited. Cf. *Fitchburg Gas & Elec. Light Co.* v. *Department of Pub. Utils.*, 375 Mass. 571, 575 (1978).

The case will be remanded to the Superior Court for the entry of an appropriate judgment declaring that the rate order under review is valid.[30]

*So ordered.*

---

[30] As the action was declaratory, the judgment entered below is irregular as to form in "affirming" the rate order and "dismissing" the complaint in the action without making a declaration. See *Jacobson* v. *Jacobson*, 334 Mass. 658, 662 (1956).