HOTEL DYNAMICS, INC. *vs.* ARCHITECTURAL ACCESS BOARD.

No. 89-P-882.

Barnstable. December 10, 1990. - March 22, 1991.

Present: BROWN, KAPLAN, & IRELAND, JJ.

*Architectural Access Board. Handicapped Persons. Administrative Law*, Agency's interpretation of regulation.

The Architectural Access Board properly referred to the assessment of record at the date a building permit was issued to establish the valuation of certain property for the purpose determining whether the structure was exempt from the accessibility requirements set forth in 521 Code Mass. Regs. §§ 3.00(3.3), (7.1)-(7.5) (1982). [281-283]

The Architectural Access Board properly used actual cost figures for improvements to certain real estate, rather than the estimated costs shown on the building permits, in determining whether the structure was exempt from the accessibility requirements set forth in 521 Code Mass. Regs. §§ 3.00(3.3), (7.1)-(7.5) (1982). [283]

A matter was remanded to the Architectural Access Board for consideration of the costs fairly related to new construction on a structure for the purpose of determining the applicability of accessibility requirements set forth in 521 Code Mass. Regs. §§ 3.00(3.3), (7.1)-(7.5) (1982). [284]

CIVIL ACTION commenced in the Superior Court Department on June 16, 1987.

The case was heard by *William H. Carey*, J., on a motion for summary judgment.

*Patrick M. Butler* for the plaintiff.

*Peter Sacks*, Assistant Attorney General, for the defendant.

KAPLAN, J. In 1984, the plaintiff, Hotel Dynamics, Inc., acquired a hotel complex in Hyannis Village, Barnstable, which consisted of five buildings grouped around a central courtyard and pool, with a total of 211 lodging rooms, a restaurant, lounge, and meeting rooms. Early in 1985, the plain-

tiff undertook the construction of a new building with fifty lodging rooms and an exercise room and, in the existing complex, the renovation and enlargement of "function rooms." On March 25 and June 19, 1985, the plaintiff obtained from the town building inspector permits, respectively, for the new building, with an estimated cost of $650,000, and for the rest, with a $450,000 estimated cost.

Now the plaintiff had to take care to meet the regulations of the defendant Architectural Access Board[1] dealing with the accessibility of public premises to handicapped persons.[2] The constitutive statute, G. L. c. 22, § 13A, as appearing in St. 1974, c. 528, § 1, directs the board to ensure that "construction, reconstruction, alteration or remodeling" of buildings is done in a way to provide accessibility. While existing structures generally are exempt, the regulations assume "jurisdiction" over them if major renovation or expansion takes place. 521 Code Mass. Regs. § 3.00(3.3) (1982). Specifically, there is a twenty-five percent rule: if the cost of the construction work involved "amounts to more than twenty-five percent (25%) of the one-hundred percent (100%) equalized assessed value of the building [meaning existing buildings], the entire facility shall comply" — in the case of a hotel, with a requirement that five percent of rooms shall be "accessible." See 521 Code Mass. Regs. §§ 3.00(3.3), (7.1)-(7.5) (1982).[3]

To return to the plaintiff, on July 9, 1985, it wrote to the board requesting approval of the plan to make accessible

---

[1]Known at the time as the Architectural Barriers Board.

[2]In 1985, the board's regulations defined "accessible" as "[s]afely approached, entered, and/or used by physically handicapped persons." 521 Code Mass. Regs. § 3.00(5.2) (1982). (A similar definition was later set out by amendment of the statute, G. L. c. 22, § 13A, as inserted by St. 1986, c. 642, § 2.) The regulations describe the technical requirements for particular facilities, dealing with such features as curb cuts, elevators, wide doorways, and toilet handrails. See generally 521 Code Mass. Regs. §§ 3.00(25)-(40) (1982). "Public building" is defined in the regulations to include "privately . . . financed buildings that are open to and used by the public." 521 Code Mass. Regs. § 3.00(5.16.2) (1982).

[3]All construction within a twenty-four month period counts toward the twenty-five percent threshold. 521 Code Mass. Regs. § 3.00(3.5) (1982).

only four of the fifty rooms in the new building; it considered the twenty-five percent rule to be inapplicable. Evidently the plaintiff misunderstood what was entailed in that rule, for it submitted an architect's letter about "areas" without data about assessed values. At a meeting with a board employee on March 5, 1986, the plaintiff was mistakenly citing the 1984 purchase price as relevant. When the board employee pointed to the criterion of assessed value, the plaintiff responded in a letter of March 6, 1986, stating that it would secure assessment figures from the town of Barnstable.

Here began concern about which year's assessment of the existing buildings should apply. When, on May 1, 1986, the plaintiff wrote to the board requesting an "advisory opinion" (as allowed by 521 Code Mass. Regs. §§ 2.09, 3.00[4.5] [1982]) about application of the twenty-five percent rule, it noted an assessed value of $4,945,000 on January 1, 1984,[4] but then went on to use the 1984 purchase price, $8,250,000, as the base for comparison with the total low-bid price for the new work of $1,487,880.97, yielding eighteen percent. On May 8, 1986, the board advised the plaintiff that it rejected the purchase price comparison and that under the twenty-five percent rule the entire complex fell under the regulations.[5] The board reiterated its position in a letter of August 1, 1986.

Replying on August 19, 1986, the plaintiff stated that it was awaiting issuance of the fiscal 1986 tax bills by the Barnstable tax assessor, as those bills would be based upon "the most recent property valuations and will include, we believe, the additional rooms."[6] Upon securing this information, the plaintiff said, it would determine whether "the [twenty-

---

[4]In its letter, the plaintiff said this was the assessed value on January 1, 1985, but the plaintiff's attorney stated afterward that the date was January 1, 1984. That was so; no later figure was available when the plaintiff requested the advisory opinion.

[5]The board used the cost figure, $1,487,880.97, and assessed value figure, $4,945,000, provided by the plaintiff in its request, resulting in a percentage of approximately thirty percent.

[6]We observe that the "additional rooms" would not figure in the valuation; it was the value of existing buildings.

five percent] equalized assessed value figure is applicable, and if so, we will proceed with a request for a variance," meaning a variance from the regulations, see 521 Code Mass. Regs. § 3.00( 4.1) (1982). On December 29, 1986, the plaintiff wrote that it had received the 1986 tax bill, but, because it reflected a January 1, 1985, assessment, it would not submit that value to the board; instead, it would wait for the 1987 tax bill "due out the next two weeks" and would submit that figure. This drew a board response repeating its conclusion and scheduling a hearing "to discuss full compliance" for March 9, 1987.[7] Denying the attorney's request to continue the hearing until the "1986 Barnstable tax information becomes available" (i.e., the January 1, 1986, valuation needed to compute the 1987 tax bill), the board proceeded at the appointed time to consider the plaintiff's challenge to the advisory opinion.

Now the attorney said the 1987 tax bill was not really necessary;[8] the 1986 tax bill, computed as of January 1, 1985, was the proper reference; the low bid cost of approximately $1.5 million ($1,487,880.97 exactly, as noted above) was less than twenty-five percent of the newly computed assessed value of $6.2 million. After discussion, the board voted to reject this last proposal and to maintain its position that the relevant figure was $4,945,000, the most recent assessed value on record at the town assessor's office at the time the building permits were issued.

Attention then turned to deciding the cost of the new construction. The attorney argued that, from the full costs of the new work, as documented in the May 1, 1986, letter to the board, there should be subtracted those items not fitting the term "construction," defined in 521 Code Mass. Regs. § 3.00(5.8) (1982), principally as "[w]ork for which a building permit is required." Among the candidates for such sub-

---

[7] By this date the construction evidently was completed, so the issue was whether a compliance order should issue.

[8] See the reference below to the affidavit of the Barnstable tax assessor, which indicates that the 1987 assessment would not have differed from the 1986 assessment.

traction were costs for air conditioners, wallpaper, and "site work."

This view seems at first to have been well received by board members, and one member made a motion in that sense. But another member then raised the question whether costs of the work directly related to the new construction, although not itself requiring a building permit, were to be subtracted. The chairperson said, "If we are going to start looking — we have always held what we're looking at is what the building permit says. I always look at the cost on the building permits, and I ask for what the square footage is because you want to get a sense of whether it's a reasonable amount of money." A member then argued that $1.5 million (approximately) was the proper figure because the plaintiff had provided it as the "total construction price" in the May 1, 1986, letter seeking the advisory opinion. This view prevailed, the pending motion being withdrawn. The board denied the attorney's motion for reconsideration. On May 20, 1987, the board issued its formal ruling: In applying the twenty-five percent rule, (i) the board takes "the assessed value recorded in the assessor's office at the time the building permit is taken out," here $4,945,000; (ii) as construction costs, the board in this case takes the submitted cost of $1,487,880.97. The twenty-five percent is thus exceeded, and the entire hotel must comply with regulations (meaning thirteen accessible rooms).

The plaintiff sought judicial review pursuant to G. L. c. 30A, § 14 (see also 521 Code Mass. Regs. § 3.00[4.4] [1982]), by the Superior Court, which summarily affirmed, and the plaintiff appeals to our court.

1. *The assessment question.* The plaintiff contends that the board erred in using the January 1, 1984, assessment. Instead, says the plaintiff, the appropriate figure is the January 1, 1985, assessment, which was not publicly available until October, 1986, for this would better reflect the "actual" assessed value as of the time when the building permits were issued in March and June, 1985.

The regulations do not point clearly to that assessment which should control: they refer to the "100% equalized assessed value of the building." 521 Code Mass. Regs. § 3.00(3.3) (1982). The board asserts, and we accept, that it has interpreted its regulations, and in practice has consistently applied them, as referring to the assessment of record at the date the building permit is issued. To some extent, it must be confessed, this is arbitrary; but so also is, and must be, the very figure twenty-five percent. The board's practice has the virtue of easy identification of the figure and easy access to it. It avoids waiting periods to locate the applicable assessment. In the run of cases there are advantages in this practice for the persons regulated as well as the regulators.[9]

An affidavit of the Barnstable tax assessor, received upon the plaintiff's motion to reconsider, is instructive. Barnstable revalues property "on a three year cycle." Revaluation occurred as of January 1, 1982, so the 1984 figure was at the end of the cycle. It just happened that 1985 was a reassessment year, so the plaintiff could say with some plausibility, let's wait. In fact, the 1984 figures ($6.2 million for the present property) were issued late because of changes in computer methodology. As the Barnstable tax valuations are not on a yearly basis (nor are the State equalizations), the number called for by the board's practice will often be "old." But the alternative is a protraction of the process to find a different number which may not be much preferable.

We give weight to the board's practical interpretation of its own regulations, see *Greenleaf Fin. Co.* v. *Small Loans Regulatory Bd.*, 377 Mass. 282, 293 (1979); *Northbridge* v.

---

[9]An analogous set of provisions governing "alterations" is perhaps more explicit in supporting the board's practice. By 521 Code Mass. Regs. § 3.00(3.4) (1982) the twenty-five percent threshold is lowered when the work in question is "alteration." Elsewhere alteration is defined as "External or internal rehabilitation" where the cost exceeds five percent of the "Full and Fair Cash Value of the Building," this term being further defined, 521 Code Mass. Regs. § 3.00(5.10) (1982), as the value "as recorded in the assessor's office" and equalized, using the "most recent" State determination of assessment ratios.

*Natick*, 394 Mass. 70, 74 (1985), and find it rational rather than capricious.

The plaintiff objects that the board did not equalize the assessment it adopted.[10] True, but, according to the plaintiff's tax bill provided to the board, the hotel complex is classified in category "300," commercial. The equalization rate for "300" in Barnstable in 1984 was 1.00. See the Biennial Report of the Commissioner of Revenue as reprinted in 1985 House Doc. No. 5012.

2. *The question of costs.* (a) The plaintiff argues that the base taken for construction costs should be the total estimated costs of $1,100,000 shown on the building permits rather than the low-bid costs provided by the plaintiff itself to the board, $1,487,880.97. The argument refers to the remarks of the chairperson quoted above, but, examined in context, the statement, we think, was meant only to suggest that the figures on the permits may be used as some evidence of the approximate amounts of construction costs. There is no reason to think that such figures are meant to be conclusive.

The board's use of a base of actual cost figures, where available, is reasonable and conforms to the text of regulations.[11] In the present case the board has been content to accept the "low-bid" figure as tantamount to actual costs. This may well have favored the plaintiff by understating the final costs. While the lodestar of decision is actual cost, the board must have some measure of discretion as to the time when figures are taken to be final.

---

[10]Assessed valuations are equalized using a ratio provided biennially by the Department of Revenue. The department computes a ratio for each property classification in every city and town, utilizing a random survey of real estate transactions. The ratio is intended to correct the listed assessments in the direction of reflecting market values. See further *Sudbury* v. *Commissioner of Corps. & Taxn.*, 366 Mass. 558, 559-569 (1974).

[11]The regulations describing the twenty-five percent and related rules, 521 Code Mass. Regs. § 3.00(3.3) (1982), cover "construction . . . as defined in these Regulations" and use the expressions "the cost of the work" and "the work being performed amounts to [less or more than a given percentage.]"

(b) The further question is the narrow one raised, but skirted and left unanswered, in the discussion at the board hearing: Just which costs, taken to be actual, were fairly related to "construction," as properly understood for this purpose? What, indeed, about such items as air conditioners, wallpaper, "site work"? No particular regulations have been cited on this matter, and the board may have to generate common law.

The foregoing opinion is written at some length to suggest that the board might, if feasible, consider improving its regulations at the points noted where they are less than clear.

The matter is to be remanded to the board for consideration of the narrow question with regard to construction costs mentioned in (b) above; otherwise the judgment appealed from is affirmed.[12]

*So ordered.*

---

[12]We encourage the parties to agree upon the probable results of the remand and thus obviate the need for it.